UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO.: ________

| | | |
|---|---|---|
| AARON HANNON<br>Plaintiff,<br><br>vs.<br><br>GARRY MCFADDEN in his Official capacity; CAROLYN ASHE in her Individual capacity; STEVEN BUCHANAN in his Individual capacity; DARRYL CARTER in his Individual capacity; WILLIAM CLEMENS in his Individual capacity; MELISHA DIXON in her Individual capacity; ANTHONY DURRAH in his Individual capacity; ALFRED JERRELL in his Individual capacity; VIVIAN LACKEY in her Individual capacity; AGLORISE PERRY in her Individual capacity; JACOB ST. LAURENT, in his Individual capacity; WILLIAM VAN ALLEN in his Individual capacity; EDITH AMECHI in her Individual capacity; NIA ANDERSON in her Individual capacity; KRISTIN HAILEY in her Individual capacity; FELICITY MARTIN in her Individual capacity; WADE SKINNER in his Individual capacity; MECKLENBURG COUNTY; RESERVE HEALTH, PC; DANIEL T. BIONDI in his Official and Individual capacity; FREDERICK COYER in his Individual capacity; SAMANTHA ELLIOT-MCLAREN in her Individual capacity MARY LE-BLISS in her Individual capacity; JENNA SMITH In her Individual capacity; GRACE UDUKA in her Individual capacity; and OHIO CASUALTY INSURANCE COMPANY;<br>Defendants. | ) | **COMPLAINT** |

NOW COMES Plaintiff, Aaron Hannon, by and through counsel, complaining of Defendants jointly and severally, hereby alleges and says:

## INTRODUCTION

1. On April 17, 2024, Aaron Hannon ("Mr. Hannon") was taken into custody and detained at the Mecklenburg County Detention Center Central ("MCDCC") where he remained detained for the next 13 days until his release on April 30, 2024.

2. On the date of his admission to MCDCC, Mr. Hannon was 54 years old, had been physically disabled for more than a decade, and suffered from complex, serious medical conditions including diabetes, cardiac disease, hypertension, and neuropathy, for which he was under the care of multi-disciplinary medical team.

3. Upon admission to MCDCC, Mr. Hannon disclosed his disability, diagnoses, history of amputations and risks for diabetic infection to MCDCC medical admission staff and executed medical and pharmaceutical releases for MCDCC to gather his records and bridge his care. Despite his medical condition and despite having executed releases, MCDCC attempted but failed to collect Mr. Hannon's medical records.

4. Mr. Hannon was ordered by MCDCC Arrest Processing staff to relinquish his personal clothing and footwear. Mr. Hannon complied and was ordered to put on the MCDCC-issued jumpsuit and flip flops. He attempted to place his feet into the flip flops, but he could not. He explained to detention staff that he wore a U.S. men's size 15EEEE shoe and that the flip-flops were too narrow and too short. MCDCC detention staff ordered Mr. Hannon to force his feet into the flip flops.

5. Although Mr. Hannon complied with the orders, his feet were excessively constricted, and his toes extended over the front of the flip flop, leaving them no barrier from the floors of MCDCC.

6. Mr. Hannon's requests for footwear that fit or to be permitted to wear his own shoes began while he was being processed into MCDCC and continued until the day that he was released. For his entire 13-day detention, all of Mr. Hannon's requests for footwear that fit, or to wear his own shoes, were denied.

7. Within two days of his admission to MCDCC, the ill-fitting footwear, combined with skin exposure to the MCDCC floors, caused Mr. Hannon to develop multiple bilateral, diabetic ulcerations on his toes.

8. He recognized the ulcerations and immediately requested medical care. Mr. Hannon was seen by an MCDCC nurse who documented that Mr. Hannon had developed bilateral diabetic foot infections (DFIs), cleansed the wounds and contacted an MCDCC nurse practitioner via phone, who issued a prescription for Augmentin, an oral antibiotic.

9. Over the course of the following 13 days, Mr. Hannon's infection worsened, his prescribed medications were routinely withheld and not administered, and despite an order for daily wound care to treat his DFIs, his infections were only cleansed and redressed four times.

10. Although his infections were not arrested by the oral antibiotics, no member of MCDCC medical staff ever took steps to identify the infecting pathogens or to test the efficacy of the Augmentin on his infections, allowing his infections to progress.

11. Recognizing the harmful impact the ill-fitting flip flops were having on Mr. Hannon's DFIs, a physician assistant ordered that Mr. Hannon be given a shoe pass from MCDCC detention staff and that he be provided with shoes that fit his feet or that he be allowed to wear his own shoes.

12. In spite of this medical order, MCDCC detention staff did not comply and forced Mr. Hannon to wear the flip flops that caused his condition to worsen day over day.

13. Despite his MCDCC medical records documenting more than 40 missed doses of prescription medications, and multiple lapses in wound care, no member of MCDCC detention, medical or supervisory staff intervened to correct the lapses and prevent future lapses in care.

14. After seeing Mr. Hannon's swollen legs, open wounds oozing with blood and puss, no member of MCDCC detention staff, including the Detention Defendants, complied with the shoe pass order or took any steps to provide Mr. Hannon with a shoe barrier from the floors of MCDCC.

15. Although Mr. Hannon's DFIs were cleansed and bandaged four times during his detention, rather than daily, never did he received standard diabetic wound care which includes, but is not limited to, wound drainage, bone probing, measurement or photograph of the wounds and pressure offsetting.

16. Within hours of his release from MCDCC, Mr. Hannon went to Atrium Mercy Emergency Room for medical treatment for his DFIs. He was placed on aggressive, oral antibiotics, as a last effort to arrest his infections and prevent amputations.

17. Within days of those final efforts, it was confirmed that his DFIs had advanced to osteomyelitis, a potentially lethal infection of the bone and bone marrow.

18. The wounds Mr. Hannon suffered at MCDCC coupled with the substandard care he received while there ultimately resulted in Mr. Hannon having to undergo multiple, bilateral toe amputations on May 15, 2024.

19. Mr. Hannon brings this civil action pursuant to 42 U.S.C. § 1983, against (a) the individual Defendants for deliberate indifference to his serious medical needs in violation of his substantive due process rights under the Fourteenth Amendment and (b) Defendants Mecklenburg County, Sheriff McFadden, Dr. Biondi and Reserve Health, P.C. for their inadequate medical plan, their failure to train and supervise their staff and their respective policies and/or customs of deliberate indifference to the serious medical needs of residents like himself as reflected by the lack of supervision and training of their employees and agents..

20. Mr. Hannon also brings claims under North Carolina law, including: (a) an official bond action, under N.C. Gen. Stat. § 58-76-5 against Sheriff McFadden and Ohio Casualty Insurance Company, (b) medical malpractice claims against the Medical Defendants, Dr. Biondi and Reserve Health, P.C., and (c) a corporate negligence and gross negligence action against Reserve Health, P.C.

## JURISDICTION AND VENUE

21. Mr. Hannon brings this civil action pursuant to 42 U.S.C. § 1983 for acts committed by Defendants under color of state law which deprived Mr. Hannon of his due process rights as a pretrial detainee to be free from deliberate indifference to his

serious medical needs under the Fourteenth Amendment to the United States Constitution.

22. Mr. Hannon's actions arise under the United States Constitution and the laws of the United States.

23. The Court has original jurisdiction over Mr. Hannon's federal claims pursuant to 28 U.S.C. §§ 1331 (*federal question*), 1343(a)(3) and 1343(a)(4) (*civil rights*).

24. Mr. Hannon also alleges claims of medical malpractice, corporate negligence and gross negligence to recover damages for his personal injuries.

25. The Court has supplemental jurisdiction over Mr. Hannon's state law claims pursuant to 28 U.S.C. § 1367(a) because the alleged violations of federal law are substantial, and the pendent causes of action derive from a common nucleus of operative facts.

26. Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Western District of North Carolina because all of the events giving rise to this action occurred in the Western District.

## <u>PARTIES</u>

### A. PLAINTIFF AARON HANNON

27. Plaintiff, Aaron Hannon, ("Mr. Hannon") is a citizen and resident of Mecklenburg County, North Carolina.

28. Mr. Hannon was born on October 22,1969 and was 54 years old at the time of his detention at MCDCC in April of 2024.

29. Mr. Hannon had a long history of complex medical conditions including diabetes, hypertension, heart disease, and neuropathy.

30. Mr. Hannon was a pre-trial detainee and resident in the care and custody of the Mecklenburg County Sheriff at MCDCC at the time he was injured.

**B. DEFENDANTS GARRY MCFADDEN, MCDCC SUPERVISORY and DETENTION DEFENDANTS and OHIO CASUALTY**

31. Upon information and belief, Defendant Garry L. McFadden ("Sheriff McFadden") is a citizen and resident of Mecklenburg County and, at all relevant times, was and is the current Mecklenburg County Sheriff and as such, he was and is the chief law enforcement officer for Mecklenburg County. Sheriff McFadden is sued in his official capacity.

32. Defendant Sheriff McFadden is and was at all times relevant to this action:

a. in control of the MCDCC;
b. the final decision-making authority over law enforcement policies and staff of his office;
c. directly responsible for the appointment, retention, supervision and conduct of his officers, medical staff, deputies, employees and agents;
d. responsible for the care and control of the MCDCC;
e. responsible for the care and custody of residents detained or held in the MCDCC;

f. acting in the course and scope of his official duties as Sheriff of Mecklenburg County and under color of state law;

g. along with the County, responsible for providing medical and mental healthcare to MCDCC residents; and

h. vicariously liable for the actions and inactions of his agents, employees, including, but not limited to, justice officers, managers, supervisors, medical staff, detention officers, and/or deputies.

33. Upon information and belief, Defendant Captain Steven Buchanan ("Capt. Buchanan"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff assigned to Pod 2200.

34. Upon information and belief, Defendant Captain Melisha Dixon ("Capt. Dixon"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff assigned to Pod 2200.

35. Upon information and belief, Defendant Major Anthony Durrah[1] ("Maj. Durrah"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and

---

[1] Major Durrah held the rank of Captain at all times relevant to this action.

assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff assigned to Pod 2200.

36. Upon information and belief, Defendant Captain Alfred Jerrell ("Capt. Jerrell"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff assigned to Pod 2200.

37. Upon information and belief, Defendant Captain Jacob St. Laurent ("Capt. St. Laurent"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff assigned to Pod 2200.

38. Upon information and belief, Defendant Captain William Van Allen ("Capt. Van Allen"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff assigned to Pod 2200.

39. Upon information and belief, Defendant Sergeant Carolyn Ashe ("Sgt. Ashe"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff assigned to pod 2200.

40. Upon information and belief, Defendant Sergeant Darryl Carter ("Sgt. Carter"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff assigned to pod 2200.

41. Upon information and belief, Defendant Sergeant William Clemens ("Sgt. Clemens"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff assigned to pod 2200.

42. Upon information and belief, Defendant Sergeant Vivian Lackey ("Sgt. Lackey"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff assigned to pod 2200.

43. Upon information and belief, Defendant Sergeant Aglorise Perry ("Sgt. Perry"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff assigned to pod 2200.

44. Captains Buchanan, and Dixon, Major Durrah, and Captains Jarrell, St. Laurent and Van Allen, as well as Sergeants Ashe, Carter, Clemens, Lackey and Perry are hereinafter collectively referred to as the "Supervisory Defendants".

45. The Supervisory Defendants were responsible for providing supervision and correction of MCDCC detention officers, as well as ensuring MCDCC detention officers were in full compliance with all MCDCC policies and procedures.

46. Upon information and belief, Defendant Detention Officer, Edith Amechi ("D.O. Amechi"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and assigned to perform resident custodial care duties within MCDCC.

47. Upon information and belief, Defendant Detention Officer, Nia Anderson ("D.O. Anderson"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and assigned to perform resident custodial care duties within MCDCC.

48. Upon information and belief, Defendant Detention Officer, Kristin Hailey ("D.O. Hailey"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and assigned to perform resident custodial care duties within MCDCC.

49. Upon information and belief, Defendant Detention Officer, Felicity Martin ("D.O. Martin"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer

employed by Sheriff McFadden, and assigned to perform resident custodial care duties within MCDCC.

50. Upon information and belief, Defendant Detention Officer, Wade Skinner ("D.O. Skinner"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and assigned to perform resident custodial care duties within MCDCC.

51. Defendants Amechi, Anderson, Hailey, Martin, and Skinner are collectively hereinafter referred to as the "Detention Defendants".

52. At all relevant times to this action the Supervisory Defendants and Detention Defendants were acting under the color of state law at the MCDCC.

53. To the extent that any of the above-named Supervisory or Detention Defendants is considered a public officer, his or her gross negligence dictates that public officer immunity would not apply.

54. Upon information and belief, Sheriff McFadden or the Mecklenburg County Sheriff's Office or the County, on the sheriff's behalf, purchased liability insurance, and/or contractually required its agents to purchase liability insurance and name Sheriff McFadden and/or the Mecklenburg County Sheriff's Office ("MCSO") as an additional insured, and/or invested/paid to participate in a local government risk pool that provides coverage for claims made by Mr. Hannon and will indemnify the Defendants, if found liable in this matter, thereby waiving any governmental immunity that might otherwise apply to the Sheriff or his agents in this action.

55. At all relevant times, Defendant Ohio Casualty Insurance Company ("Ohio Casualty") was and is a surety company and serves as the surety bond holder for Sheriff McFadden, pursuant to N.C.G.S. § 58-76-5 and N.C.G.S. § 162-8.

56. Upon information and belief, Ohio Casualty, as the surety bond holder for Sheriff McFadden, is liable for the acts of Sheriff McFadden and his agents under virtue or color of office resulting in serious harm pursuant to N.C.G.S. § 58-76-5.

57. Upon information and belief, Sheriff McFadden, on behalf of himself and his agents, waived applicable immunity by obtaining a surety bond and/or by purchasing liability insurance and/or participating in a governmental risk pool.

**C. DEFENDANT MECKLENBURG COUNTY**

58. Defendant Mecklenburg County ("the County") is a county in North Carolina organized and existing under N.C. Gen. Stat. § 153A-10, and it has all the corporate powers set forth in N.C. Gen. Stat. § 153A-11, including the power to be sued.

59. Mecklenburg County is a "unit" and "local government" under N.C. Gen. Stat. § 153A-216, *et seq*. It has the powers to establish, acquire, erect, repair, maintain, and operate a local confinement facility, also known as a detention facility or jail.

60. The County maintains and operates Mecklenburg County Detention Center Central (MCDCC) located at 801 E. 4th Street, Charlotte, North Carolina. MCDCC is designed to house over 1900 residents.

61. The County is responsible, under N.C. Gen. Stat. § 153A-225, for developing an adequate medical plan that protects the health and welfare of MCDCC residents, including protecting against the spread of contagious disease, providing for medical

supervision and emergency medical care for residents to the extent necessary to ensure their health and welfare.

62. At all times relevant to this action, the County had final policymaking authority over the provision of medical care and emergency medical care to residents at MCDCC.

63. Upon information and belief, at all relevant times, Mecklenburg County and/or Sheriff McFadden contracted with Wellpath, LLC[2] and Reserve Health, PC to deliver medical and mental healthcare to MCDCC residents on behalf of the County and Sheriff McFadden.

64. Upon information and belief, the County reviewed and approved the inadequate medical plan developed by Wellpath, LLC, Reserve Health, PC, Dr. Biondi and Sheriff McFadden to provide medical and mental healthcare to MCDCC residents.

65. Mecklenburg County is sued under 42 U.S.C. § 1983 for an official policy or custom of deliberate indifference to the serious medical needs of residents like Mr. Hannon, who suffered from complex medical conditions with heightened risk for serious complications.

66. Upon information and belief, by obtaining liability insurance and/or participation in a governmental risk pool, or by contractually requiring its agents to purchase liability insurance and name Mecklenburg County as an additional insured, the County, on its own behalf as well as on its agents' behalf, has waived governmental immunity.

---

[2] Wellpath has filed for bankruptcy and is not a named defendant in this complaint.

## D. DEFENDANTS RESERVE HEALTH, DR. BIONDI AND THE MEDICAL DEFENDANTS

67. Upon information and belief, Defendant Reserve Health, P.C. ("Reserve Health") contracted with Wellpath, LLC and/or Sheriff McFadden and/or Mecklenburg County to provide the services of Medical Director, medical physician services, medical nurse practitioner services, medical physician assistant services, mental health physician services and medication prescribing services for MCDCC residents.

68. Defendant Reserve Health is a North Carolina corporation, licensed and doing business in Mecklenburg County, North Carolina.

69. Reserve Health is sued for its own tortious wrongdoing, as well as under the theory of respondeat superior for the acts and failures to act by its employees responsible for providing medical and mental healthcare services for MCDCC residents, including Mr. Hannon.

70. Upon information and belief, Defendant Doctor Daniel T. Biondi ("Dr. Biondi"), is a resident of Mecklenburg County, North Carolina, and was, at all relevant times, a physician licensed in North Carolina, practicing with Reserve Health and employed by or contracted by Mecklenburg County and/or Sheriff McFadden and/or Wellpath, LLC to provide and oversee healthcare services to MCDCC residents. Dr. Biondi is named in his individual capacity and his official capacity as MCDCC Medical Director and President of Reserve Health.

71. At all times relevant to this action, Dr. Biondi was the Medical Director and Chief Physician of MCDCC and was charged with the supervision and oversight of the

medical staff at MCDCC, including, but not limited to, the following personnel:

Mary LeBliss, MD

Kirby Bandoquillo, NP

Frederick Coyer, PA

Samantha Elliott McLaren, RN

Shadala Fair, RN

Darica Klein, RN

Velma McCown, RN

Jenna Smith, RN

Adrienne Thomas, RN

Grace Uduka, RN

Aaliyah Carr, LNA

Roxanne Deaton, LNA

Kiara Smith, LNA

Shanta Smith, LNA

Josephine Bashaka, LNA

Tiana Motley, LPN

Aryn Graham, LPN

72. Upon information and belief, Defendant Mary Le-Bliss ("Dr. Le-Bliss") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Reserve Health or Wellpath as a Physician to provide medical care and

services, including diagnostic and medication prescribing services to MCDCC residents. Dr. Le-Bliss is named in her individual capacity.

73. Upon information and belief, Defendant Frederick Coyer ("Coyer") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Reserve Health or Wellpath as a Physician Assistant (PA) to provide medical care and services, including diagnostic and medication prescribing services to MCDCC residents. Coyer is named in his individual capacity.

74. Upon information and belief, Defendant Samantha Elliott-McLaren, ("Elliott-McLaren") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath and supervised through Reserve Health, as a Registered Nurse employed to provide medical care to MCDCC residents. Elliott-McLaren is named in her individual capacity.

75. Upon information and belief, Defendant Grace Uduka, ("Uduka") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath and supervised through Reserve Health, as a Registered Nurse employed to provide medical care to MCDCC residents. Smith is named in her individual capacity.

76. Upon information and belief, Defendant Jenna Smith, ("Smith") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath and supervised through Reserve Health, as a Registered Nurse employed to provide medical care to MCDCC residents. Smith is named in her individual capacity.

77. Defendants Le-Bliss, Coyer, Elliott-McLaren, Uduka and Smith are collectively referred to herein as the "Medical Defendants."

78. At all relevant times to this action the Medical Defendants were acting under the color of state law at the MCDCC.

79. The Medical Defendants, Dr. Biondi and Reserve Health were responsible for providing Mr. Hannon with health care at all relevant times to this action.

80. Dr. Biondi and the Medical Defendants were acting within the course and scope of their employment at all relevant times to this action. At all relevant times to this action, Dr. Biondi and the Medical Defendants were health care providers as defined in N.C. Gen. Stat. § 90-21.11.

81. In addition to his civil rights claims, Mr. Hannon sets forth claims of medical malpractice under North Carolina law alleging the Medical Defendants failed to comply with the applicable standard of care under N.C. Gen. Stat. § 90-21.12(a) in their care and treatment of Mr. Hannon.

82. The medical care provided to Mr. Hannon by the Medical Defendants and supervised by Dr. Biondi and all the medical records pertaining to the alleged negligence and gross negligence that are available to Plaintiff after reasonable inquiry, have been reviewed by a licensed physician, and a licensed nurse practitioner who are reasonably expected to qualify as expert witnesses under Rule 702 of the North Carolina Rules of Evidence and are each willing to testify that the medical care provided by the Medical Defendants supervised by Biondi did not comply with the applicable standard of care for such health care providers.

## FACTUAL ALLEGATIONS

### A. BACKGROUND INFORMATION

83. Plaintiff incorporates the paragraphs above as if fully set forth herein.

84. The Mecklenburg County Detention Center Central (MCDCC) was constructed in 1997 and all operations officially moved into the facility in 1997. It consists of several administration offices, a public lobby and processing, booking, and releasing areas, a medical station, and five resident housing blocks referred to as pods.

85. At all times herein, a person held at the MCDCC is referred to as a "resident" or collectively as "residents."

86. By operation of North Carolina statute, the elected Sheriff, through his employees and agents, is responsible for operations of the MCDCC, including the care and supervision of residents, oversight of resident healthcare, and full compliance with State and Federal law, the North Carolina Administrative Code and all MCDCC policies, methods, and procedures to provide for the security, safety and health of all MCDCC residents, as well as the security and safety of employees and agents assigned to the MCDCC.

87. Upon information and belief, Wellpath, LLC served as Sheriff McFadden's agent to employ and provide medical staff to serve MCDCC residents, as proscribed under Wellpath's contract with the County and/or Sheriff McFadden, to provide healthcare services, including medical and mental healthcare, to all MCDCC residents.

88. Pursuant to its contract, Reserve Health and its agent, Dr. Biondi provided supervision of all professional medical, mental health, dental and related healthcare services for MCDCC residents, including sick calls, nursing care, physician care,

medical sub-specialty services, psychiatric care and other healthcare services based on the healthcare needs of the MCDCC residents.

89. Upon information and belief, MCDCC medical providers, including Dr. Biondi and the Medical Defendants, were, at all relevant times, responsible for executing the medical plan established and/or approved by the County, Defendant McFadden, Wellpath and Dr. Biondi, to provide healthcare to MCDCC residents.

90. Upon information and belief, Sheriff McFadden and the Supervisory Defendants were, at all times relevant to this action, responsible for creating, implementing and complying with Sheriff McFadden's policies and procedures for the MCDCC. Additionally, Sheriff McFadden and the Supervisory Defendants were responsible for training, supervising and overseeing the Detention Defendants assigned to work at MCDCC.

91. Upon information and belief, the Supervisory Defendants and Detention Defendants were, at all times relevant to this action, responsible for compliance with all MCSO policies and procedures for MCDCC, including compliance with medical orders issued by MCDCC medical providers.

92. Upon information and belief, Dr. Biondi and the Medical Defendants were, at all relevant times, responsible for compliance with MCSO's policies and procedures for MCDCC, including implementation of the County approved medical plan.

93. In accordance with 10A North Carolina Administrative Code 14J ("10A NCAC 14J"), the operations of the MCDCC are governed by the following industry standards:

a. Appalachian State University, Model Policies and Procedures Manual for North Carolina Jails; American Correctional Association, Standards for Adult Local Detention Facilities;

b. American Correctional Association, Standards for Small Jails;

c. National Commission on Correctional Healthcare, Standards for Health Services in Jails; and

d. United States Marshal Service Policy Directives for the provision and management of healthcare services to prisoners in the custody of the United States Marshals Service.

94. Under the United State Constitution and the North Carolina State Constitution, Mecklenburg County and Sheriff McFadden have a non-delegable duty to provide adequate medical care to MCDCC residents.

95. Upon information and belief, the Mecklenburg County Sheriff's Office is accredited by the National Commission on Correctional Healthcare ("NCCHC") and, in addition to the medical standards imposed by the State of North Carolina, it has otherwise agreed to maintain compliance with 100% of the essential standards established by NCCHC in the operation of MCDCC.

96. All named defendants knew, or should have known, that deliberate indifference to the serious medical needs of a MCDCC resident constitutes unnecessary and wanton infliction of pain, as proscribed by the Eighth and Fourteenth Amendments to the United States Constitution, and the parallel provisions of our state constitution, as well as negligent, grossly negligent, and/or willful and wanton conduct.

97. On December 4, 2018, Defendant McFadden was sworn into office as the Sheriff of Mecklenburg County.

98. By the spring of 2024, Defendant McFadden had served as the County's elected sheriff for just over five years and during that period, under his exclusive leadership and authority, there were more than eighteen resident deaths at the MCDCC.

99. This Complaint is at least the eighth civil complaint filed as a result of yet another tragic, preventable consequence from substandard medical care for a MCDCC resident whose care and well-being were entrusted to Mecklenburg County, Defendant McFadden, his employees and agents.

## B. AARON HANNON'S HEALTH CONDITIONS

100. In 2014, at the age of 45 years, Aaron Hannon was deemed disabled by the Social Security Administration due to a myriad of complex, chronic medical conditions that significantly impaired his ability to function and live independently. He relied on family members for housing and care and relied on Social Security Disability benefits for income.

101. His complex medical conditions, including diabetes, hypertension, heart disease, and neuropathy, created greater susceptibility to health complications, including, but not limited to, cardiac failure, renal failure, complex systemic infection and limb amputation.

102. The education he was provided by his treating doctors for the management of his diabetes included the need to vigilantly monitor his lower extremities for changes

in the appearance or sensation of skin, and/or the presentation of wounds upon the skin and to seek immediate medical attention if any such changes occurred.

103. Mr. Hannon's treating physicians emphasized the critical need for consistent care of his lower extremities to ensure limb preservation and to manage his heightened risk of amputation, based on his diagnoses.

104. For more than two decades, examination of his calves and feet, was chief among Mr. Hannon's daily habits.

105. Osteomyelitis is a serious infection and inflammation of the bone tissue or bone marrow, typically caused by bacteria or fungi, most commonly Staphylococcus bacteria. Diabetic patients have up to a 60% risk of contracting osteomyelitis if they suffer a diabetic foot ulcer.

106. Aaron Hannon heeded his physicians' instructions and was vigilant in the daily examination, care and treatment of his calves and feet.

107. At the time of his admission to MCDCC, Mr. Hannon suffered no lower extremity wounds or infections.

## C. STANDARD OF CARE FOR PATIENTS WITH DIABETIC FOOT

108. In diabetic patients, any foot ulcer is serious. Diabetic foot ulcers present a risk of developing infection that can lead to osteomyelitis and amputation. Prompt diagnosis and proper treatment are necessary to prevent amputation. Left untreated, osteomyelitis is lethal.

109. The standard of care with respect to a diabetic patient with an infected diabetic foot wound requires aggressive wound care and proper and effective antibiotic therapy.

110. All patients presenting with diabetic foot infection should have radiological studies of the affected foot performed to detect bone abnormalities as well as soft tissue gas which indicates complex infection. Magnetic resonance imaging (MRI) is the imaging method recommended for patients with diabetic foot infections because it permits more sensitive and specific imaging of soft tissue and produces a more exact result.

111. Standard diabetic wound care permits mild, soft tissue infections to be treated effectively with oral antibiotics, such as dicloxacillin, cephalexin and clindamycin, however oral antibiotic therapy should be administered in conjunction with physical wound care until there is evidence that the infection has resolved, which usually requires one to two weeks of the combined therapies.

112. For moderate to severe soft tissue infections, intravenous antibiotics should be administered for a period of two to four weeks.

113. Standard diabetic wound care requires close monitoring of infected wounds as it is critical to determine whether there is healing and improvement or if there is a need for modification in the antibiotic therapy or surgical intervention.

114. Certain factors increase the likelihood of osteomyelitis resulting from infected diabetic wounds. They include: (1) grossly visible bone or open access allowing the

ability to probe the bone and (2) duration of an ulcer, absent signs of healing, longer than one to two weeks.

115. Patients suffering from diabetic foot infection should receive wound care which consists of drainage to decrease bacterial load around the wound, possible debridement to remove any necrotic tissues, bone probing, physical redistribution of pressure off the wound (known as offloading), measurement or photograph of the wounds and appropriate medical dressings to allow for optimum wound healing. To allow for healing and relieve pressure from the wound as indicated, the standard of care recommends that therapeutic/orthopedic footwear be prescribed.

116. Upon information and belief, the County approved medical plan and MCSO policies and procedures failed to address or include required standard of care for diabetic residents and failed to require that MCDCC staff enforce or follow medical orders related to care for diabetic residents.

## D. AARON HANNON'S DETENTION IN POD 3200 AT MCDCC

117. On Wednesday, April 17, 2024, Aaron Hannon was taken into custody, charged and detained at the Mecklenburg County Detention Center Central (MCDCC) which resulted from an incident where Mr. Hannon attempted to protect a family member involved in a domestic dispute. The charges against Mr. Hannon were later voluntarily dismissed by the Mecklenburg County District Attorney.

118. Upon intake, Defendant Elliot-McLaren, a registered nurse, conducted Mr. Hannon's medical intake consultation and facility admission exam.

119. When Elliot-McLaren requested that Mr. Hannon sign the MCDCC medical and pharmaceutical releases so that his medical and pharmaceutical records could be collected, he complied.

120. Mr. Hannon explained to Elliot-McClaren that he was on multiple medications, managing multiple diagnoses and chronic conditions, including Type 2 diabetes, high blood pressure and a heart condition.

121. Mr. Hannon informed Elliot-McLaren that he was a disabled amputee who suffered complications that initially began with infected foot wounds. Mr. Hannon explained to Elliot-McLaren that he had significantly heightened susceptibility to skin infection, particularly to his lower extremities.

122. Elliot-McLaren directly observed Mr. Hannon during the time it took her to complete the twelve-page MCDCC Medical Receiving Screening package, while she gathered his executed medical releases, and during the time she collected his vital signs.

123. Despite Mr. Hannon reporting his diagnoses, treatment and prior amputations, Elliot-McLaren checked "***no***" within the medical screening form for the inquiry related to the need for accommodations based on medical conditions.

124. Elliot-McLaren made no inquiries or notes concerning Mr. Hannon's prior toe amputations and failed to make or document any assessment concerning Mr. Hannon's feet. She also failed to address his immediate medication needs based on his chronic conditions for which he was prescribed medication, susceptibility to infection, or prior amputations.

125. Just as his doctors stressed, Mr. Hannon stressed to MCDCC medical intake staff, including Elliot-McLaren, the critical importance for him to protect his feet, ensure good circulation and avoid the risk of injury and infection on his lower extremities.

126. After completing his medical intake screening, Elliot-McLaren cleared Mr. Hannon for admission to MCDCC and referred him for only routine chronic care.

127. Before he was transferred to Pod 3200, MDCC's orientation pod, MCDCC detention staff advised Mr. Hannon that he was required to exchange his own clothing and shoes for an MCDCC-issued jumpsuit and a pair of MCDCC-issued flip flops. Mr. Hannon complied and relinquished his clothing and shoes.

128. Mr. Hannon wore a size US Men's 15EEEE shoe and his foot measured 12 ¼ inches in length and 5 ¼ inches in width. Upon information and belief, the flip flops issued by MCDCC staff to Mr. Hannon on April 17th, were 9 to 10 inches long and 4 to 4 ½ inches wide and did not fit Mr. Hannon's feet.

129. When Mr. Hannon attempted to put his foot into the MCDCC-issued flip flop, the width of the flip flop could not accommodate his foot and he showed the detention officer that he could not get the flip flop onto his foot.

130. The detention officer advised Mr. Hannon to place the flip flop on the floor, against the wall, swing his leg back and "jam" his foot into the flip flop. When Mr. Hannon laughed in response, the detention officer stated, "I'm not kidding dude".

131. Mr. Hannon requested larger flip flops and was told larger flip flops were not available.

132. Mr. Hannon did as he was ordered to, swung each of his legs, using physical force, to jam each of his feet into the MCDCC-issued flip flops.

133. The MCDCC-issued flip-flop severely constricted the width of Mr. Hannon's feet and the top portion of each foot and all toes hung over the front of the flip flop, exposed and unprotected, providing no shoe barrier for his toes from the floors at MCDCC.

134. After arriving to MCDCC's Orientation Pod, Mr. Hannon reported to D.O. Baker that the flip flops issued were too small and did not fit his feet, that they did not fully cover the length of his feet, and were "strangling" the width of his feet.

135. Upon information and belief, later that evening, D.O. Macon, under the supervision of Sgt. Pettis and Cpt. Houpe, responded to Mr. Hannon's second request for bigger flip flops and told him longer, wider flip flops or shoes were unavailable.

136. By early the next morning, Thursday, April 18th, Mr. Hannon had not received any of his prescription medications. He was experiencing excessive sweating, light-headedness, irregular body temperature and overall weakness. He requested to be taken to the infirmary where he was seen by Nurse Thomas.

137. Nurse Thomas contacted the on-call provider, Kirby Bandoquillo, who ordered a single dose of insulin and metoprolol be given in the clinic and that Mr. Hannon be seen by a provider.

138. Mr. Hannon was returned to the clinic later that morning and saw MCDCC physician, Defendant Dr. Le-Bliss.

139. Mr. Hannon explained to Defendant Le-Bliss that he was a diabetic, suffered from high blood pressure, a heart condition, and was an amputee. He told Le-Bliss

that he was ordered to wear the MCDCC-issued flip flops and showed her that they did not fit and that they were "strangling" his feet.

140. Despite this information, Defendant Le-Bliss failed to conduct a foot exam, failed to test or note that Mr. Hannon suffers from neuropathy and categorized him as a low-risk patient wearing appropriate footwear.

141. Although Mr. Hannon reported that his HbA1c was regularly a 7, Defendant Le-Bliss reported that his diabetes was under good control.

142. Finally, Le-Bliss documented that Mr. Hannon's blood pressure was elevated but that he had not received his other prescription medications. Despite having Mr. Hannon's previous blood pressure information, Dr. Le-Bliss did not document that Mr. Hannon's blood pressure had been worsening since the day before but instead inaccurately reported that it was improving.

143. During the encounters on April 18th, Mr. Hannon reported to both Nurse Thomas and Dr. Le-Bliss, that his medications were provided through Biddle Point Pharmacy on Rozzelles Ferry Road, that the pharmacy provided delivery/drop-off services for prescription medications and urged them to request his medications be delivered to MCDCC.

144. Thomas responded to Mr. Hannon's request by stating that she was required to comply with MCDCC policies and procedures which prohibited staff from accepting outside medications, including those delivered by a pharmacy.

145. Defendant Le-Bliss took no steps to ensure that Mr. Hannon's prescription and medical care were bridged or that his other medications were administered that day.

146. Defendant Le-Bliss took no steps to order Mr. Hannon be provided with footwear that fit, orthopedic footwear or a shoe barrier from the floors of MCDCC.

147. Despite his presentation, symptoms, and complex medical conditions and noting lab work should be done, Le-Bliss failed to order any metabolic testing of Mr. Hannon's blood.

148. On that same day, Mr. Hannon reported to two separate MCDCC detention officers, believed to be D.O. Baker and D.O. Macon, that the MCDCC-issued flip-flops did not support the length of his feet, and severely constricted his feet and he made the request of both detention officers for footwear that fit and supported his feet. Both D.O. Baker, without any supervision, and D.O. Macon, under the supervision of Cpt. Houpe and Sgt. Pettis, denied Mr. Hannon's requests.

149. In the early morning hours of the following day, on Friday, April 19th, LNA Deaton failed to administer Mr. Hannon's prescribed insulin injection, as well as his prescribed dosages of Xarelto, gabapentin, and isosorbide. Deaton documented the basis for withholding Mr. Hannon's insulin as "***hold one med pass***" and documented the bases for withholding his Xarelto, gabapentin and isosorbide medications as "***in transit from pharmacy***".

150. There are no other notes, records or documents in Mr. Hannon's medical records indicating that Deaton, or any other member of MCDCC medical staff, took any steps to ensure that Mr. Hannon received any of the prescribed medications that Deaton withheld and failed to administer on April 19th.

151. On the morning of April 19th, while examining the condition of his feet, Mr. Hannon noticed changes in the appearance of the skin on his toes. He reported his concerns to his pod supervisor, D.O. Gadson, and requested assistance from D.O. Gadson in obtaining larger, wider flip flops or permission to wear his own shoes. D.O. Gadson, under the supervision of Cpts. Dixon, Jerrell and McFarley and Sgt. Neece, denied Mr. Hannon's requests stating, "***That's all we got, man***."

152. D. O. Gadson took no steps to confer with medical staff regarding the issues with the footwear provided to Mr. Hannon.

153. Shortly after 12:00 pm on April 19th, Mr. Hannon's physical condition continued to worsen, so he submitted a sick call request through the MCDCC kiosk and reported concerns about the condition and appearance of his toes. The sick call was closed with no response.

154. Hours after Mr. Hannon submitted his sick call request on April 19th, Licensed Nursing Assistant, Shanta Smith, failed to administer Mr. Hannon's prescribed evening dose of his Insulin, Isosorbide Mononitrate, Xaralto and Gabapentin prescriptions. LNA Smith documented Mr. Hannon as "***out of unit***" yet there is no evidence that Mr. Hannon was not in his pod.

155. There is no documentation indicating that Smith, or any other member of MCDCC medical staff, took any steps to ensure that Mr. Hannon received the medication Smith withheld and failed to administer.

156. Later, on April 19th, Mr. Hannon spoke with his pod supervisor, D. O. Ayers. Mr. Hannon showed Ayers the condition of his feet, explained his medical history of

toe amputations, expressed his physical discomfort and concern for contracting infection and requested larger, wider flip-flops or permission to wear his own shoes. D.O. Ayers, under the supervision of Cpt. Neal and Sgt. Poteat, denied Mr. Hannon's requests.

157. Because he received no response to his first sick call request and because he was very concerned about his worsening condition, Mr. Hannon placed a second sick call request at 8:57 pm stating that he needed two toes checked as he had lost two already.

158. On Saturday, April 20th, Mr. Hannon received a written response to his request, via the kiosk that said, "You will be scheduled to come to the clinic to be assessed by the medical staff."

159. Mr. Hannon reported his continued discomfort and concerns about the wounds that had developed on his toes to his pod supervisor, D.O. Olivier.

160. Mr. Hannon showed D.O. Olivier that he was an amputee, the problems with the flip flops, and he explained that because of wearing the flip flops, he was developing open wounds on his remaining toes.

161. Mr. Hannon showed D.O. Olivier his developing open wounds, the swelling in his legs, and further explained his susceptibility to infection and begged to be taken to the MCDCC infirmary or a hospital for evaluation and treatment. D.O. Olivier, under the supervision of Cpt. Jerrell and Sgt. Neece, declined Mr. Hannon's request.

162. Several hours later, after fellow pod residents urged D.O. Olivier and FTO Simmons that Mr. Hannon was in desperate need of medical care, detention staff

escorted Mr. Hannon to the infirmary where he was seen by Registered Nurse Shadala Fair.

163. Nurse Fair examined his feet and documented Mr. Hannon's prior toe amputations, the locations of new ulcerations on his left third toe and right third toe that had developed, that the wounds were malodorous and that Mr. Hannon's legs were swollen.

164. Nurse Fair cleaned the wounds and covered them and secured the gauze with tape and told Mr. Hannon he would receive daily wound care.

165. Nurse Fair then contacted the on-call provider, Defendant PA Coyer, who ordered that Mr. Hannon be started on Augmentin, and that Hannon be scheduled to see him on Monday April 22, 2024. Coyer also ordered that Mr. Hannon be provided with an extra blanket to place under his ankles to help with the swelling and Nurse Fair entered this order into the OMS communication system for detention staff.

166. Neither Nurse Fair nor Defendant Coyer took any steps for Mr. Hannon to be accommodated with orthopedic footwear, pressure offloading shoes or inserts or any other footwear to allow for wound offloading.

167. Nurse Fair and Defendant Coyer took no steps to ensure that Mr. Hannon received footwear that covered the full length of his feet, accommodated the width of his foot or otherwise ensured that Mr. Hannon was provided with proper shoe coverage or barrier between his wounds and the floor of MCDCC.

168. During the nursing encounter on April 20th, neither Nurse Fair nor PA Coyer took any steps for any lab testing to be performed on Mr. Hannon, such as Complete Blood Count (CBC), which is a key laboratory test in proper diagnosis and treatment of diabetic foot infections.

169. Nurse Fair did not perform bone probing on Mr. Hannon's wounds to determine infection progression and more precisely gauge his risk for osteomyelitis.

170. There are no records or documents indicating that Nurse Fair or Defendant Coyer reviewed Mr. Hannon's Atrium medical records before, during or after his April 20th nursing encounter.

171. Following the encounter with Nurse Fair, D.O. Olivier and FTO Simmons, under the supervision of Cpt. Jerrell and Sgt. Neece, did not give Mr. Hannon the medically ordered second blanket, failed to provide him with footwear that covered the length of his feet and refused to permit him to wear his own shoes.

172. At shift change on April 20th, D.O. Olivier failed to communicate information or note in the shift log the problems the MCDCC flip flops were causing Mr. Hannon's feet or that he was to be given a second blanket.

173. Upon coming on duty at approximately 7:00 pm, D.O. Ayers, under the supervision of Cpt. Neal and Sgt. Poteat, failed to check the OMS communication regarding Mr. Hannon and/or failed to provide him with the medically ordered second blanket.

**E. AARON HANNON'S DETENTION IN POD 2200 AT MCDCC**

174. On the evening of April 20th, Mr. Hannon was transferred from the Orientation Pod to General Housing Pod 2200, and when he arrived Mr. Hannon spoke with the pod supervisors, D.O. Seegars and D.O. Frank, and explained that he was an amputee and showed them that the flip flops issued by MCDCC constricted his feet, and did not fully cover his feet, specifically his toes, and that as a result, he was developing open wounds on his remaining toes.

175. Mr. Hannon also showed the swelling in his legs and further explained his susceptibility to infection and begged to be taken to the MCDCC infirmary or a hospital, for evaluation and treatment, or, at the very least, for the medically ordered extra blanket. D.O. Seegars and D.O. Frank, under the supervision of Defendant Cpt. St. Laurent and Defendant Sgt. Ashe, denied Mr. Hannon's requests.

176. On that same evening, Licensed Nursing Assistant Shanta Smith failed to administer Mr. Hannon's Augmentin, the antibiotic prescribed to treat his active diabetic wound infection as well as his insulin, hydralazine, gabapentin, carvedilol, metformin, Xarelto, and isosorbide.

177. LNA Smith documented the bases for withholding and failing to administer Mr. Hannon's prescribed medications as "***out of unit***" because he had been moved out of pod 3200.

178. Although Mr. Hannon was only being moved from one pod to another, there are no notes, records or documents indicating that LNA Smith, or any other member of MCDCC medical staff, took any steps to ensure that Mr. Hannon received the medication that LNA Smith withheld and failed to administer.

179. On April 21st, Licensed Nursing Assistant, Aaliyah Carr also failed to administer Mr. Hannon's Augmentin. LNA Carr documented the bases for withholding and failing to administer Mr. Hannon's prescribed antibiotic as "***hold one med pass***".

180. There is no documentation indicating that Carr, or any other member of MCDCC medical staff, took any steps to ensure that Mr. Hannon received the antibiotic that Carr withheld and failed to administer.

181. That same day, upon information and belief, D.O. Chea acknowledged the order for daily wound care and Mr. Hannon's request to be taken to the MCDCC medical clinic and arranged for him to be escorted to the clinic.

182. Despite placing Mr. Hannon on daily wound care protocol, Defendant Coyer did not include the specifications of standard diabetic wound care of drainage, bone probing, measurement or photograph of the wounds or pressure offloading in his care plan.

183. Registered Nurse Darica Klein documented that Mr. Hannon was delivered to the clinic on April 21st for wound care, that his wounds were cleansed and covered in gauze and no drainage or foul odor was noted.

184. Despite Mr. Hannon's MCDCC medical records clearly documenting that he was being treated for diabetic wound infection and that his wounds were malodorous the previous day, Nurse Klein failed to comply with standard diabetic wound care protocol when she failed to drain his wounds, failed to perform bone probing, failed to measure the wounds or photograph them and failed to ensure measures for pressure

offloading were in place. Klein further failed to document the clinical reason upon which her departure from standard diabetic wound care protocol was based.

185. During the encounter, Klein failed to make any inquiries of Mr. Hannon concerning his antibiotic prescription, nor did Klein take any steps to ensure Mr. Hannon received the missed antibiotic dose documented in his file.

186. Additionally, Klein failed to request that D.O. Chea or Sgt. Hailey or any other detention staff, provide Mr. Hannon with the previously ordered second blanket for lower extremity elevation and likewise took no steps to ensure he received orthopedic footwear or inserts or even footwear that covered the full length of his feet and accommodated the width to ensure proper blood circulation and protection for his feet and to promote the healing of his wounds.

187. During the encounter, Mr. Hannon asked Nurse Klein about the intensifying odor of his wounds and told Klein that the wounds felt warm and inflamed. Mr. Hannon then requested to be taken to a hospital for treatment.

188. Klein's response to Mr. Hannon's questions, reports and requests was actual silence-Klein failed to respond either verbally or in writing or in any other way, to Mr. Hannon's communication.

189. Not only did Nurse Klein fail to adhere to standard diabetic wound care protocols, but she also failed to communicate with a provider to ask if she should arrange for Mr. Hannon to be transported to a hospital or other medical facility that could provide the medical treatment he required and was not receiving at MCDCC.

190. Following the nursing encounter with Klein, Mr. Hannon again spoke with his pod supervisor, D.O. Chea, about his worsening condition. D.O. Chea, under the supervision of Sgt. Nicole Hailey, failed to issue Mr. Hannon a second blanket, failed to provide him with footwear that covered the length of his feet and accommodated the width of his feet and refused to permit him to wear his own shoes.

191. Despite that Mr. Hannon was documented as a diabetic suffering from open wounds, active infection, prior amputations and the physical limitations therefrom, D.O. Chea ordered Mr. Hannon to continue to wear the MCDCC issued flip flops.

192. At evening shift change on April 21st, D.O. Chea failed to communicate information or note in the shift log the problems the MCDCC flip flops were causing Mr. Hannon's feet or that he was to be given a second blanket.

193. Upon coming on duty at approximately 7:00 pm, D.O. Seegars, under the supervision of Defendant Cpt. St. Laurent and Defendant Sgt. Ashe, failed to check the OMS communication regarding Mr. Hannon and/or failed to provide him with the medically ordered second blanket.

194. On April 22nd, Mr. Hannon spoke with his pod supervisor, upon information and belief, Defendant D.O. Nia Anderson and reported that his foot wounds were worsening. He begged to be transported to a hospital for treatment. Defendant D.O. Anderson, under the supervision of Defendants Cpt. Buchanan and Sgt. Clemens, denied Mr. Hannon's request.

195. On April 22nd, Mr. Hannon was delivered to the medical clinic for his scheduled visit, where he was seen by Defendant PA Coyer. Coyer documented that Mr. Hannon

was a high-risk diabetic with a complex medical history, that his current medical issues included the presence of multiple, bilateral open wounds on his toes, or diabetic foot infections (DFIs), and that he was an amputee.

196. Defendant Coyer ordered imaging studies for suspected bone involvement from the DFIs as well as to determine whether Mr. Hannon had developed a lower extremity blood clot.

197. Mr. Hannon's DFIs were producing pus and Coyer documented that the wounds were positive for pus and infection and that Mr. Hannon suffered from peripheral neuropathy.

198. Coyer again ordered daily wound care and ordered that Mr. Hannon receive a "Wound care Shoe pass" from MCDCC detention, which would allow Mr. Hannon to wear his own shoes instead of the flip flops.

199. Despite Mr. Hannon's MCDCC medical records clearly documenting that he was being treated for diabetic wound infection and that his wounds were malodorous and that the presence of pus remained, Coyer failed to photograph, measure, or otherwise document the status and size of the wounds.

200. Coyer also failed to comply with standard diabetic wound care protocol when he failed to drain Mr. Hannon's wounds and failed to perform bone probing and failed to clean or redress the wounds. Additionally, Coyer further failed to document the clinical reason upon which his departure from standard diabetic wound care protocol was based.

201. Not only did Coyer fail to adhere to standard diabetic wound care protocol, but he also failed to arrange for Mr. Hannon to be transported to a hospital or other medical facility that could provide the medical care, specifically the diabetic wound care Mr. Hannon required and was not receiving at MCDCC.

202. Based on Coyer's medical documentation of the April 22nd encounter with Mr. Hannon, he failed to consult with any of Mr. Hannon's treating physicians and did not consult with any MCDCC physician regarding Mr. Hannon's diagnosis and treatment.

203. Coyer failed to provide Mr. Hannon with orthopedic shoes or inserts to provide the critical pressure offloading and ensure proper blood circulation to his feet and DFIs.

204. During the encounter with Defendant Coyer, Mr. Hannon asked Coyer to order he be taken to a hospital for treatment. Coyer responded by assuring Mr. Hannon that going forward, he [Coyer] would personally oversee Mr. Hannon's care at MCDCC, and that he was ordering daily wound care, as well as imaging studies of Mr. Hannon's legs, feet and wounds.

205. Coyer failed to consult with a physician to confirm that transport to a hospital was not medically necessary for Mr. Hannon's treatment and care.

206. Dr. Biondi, who supervised Coyer's work, did not step in to ensure Mr. Hannon received the care he needed.

207. Coyer provided Mr. Hannon with compression stockings and a blanket to use for lower extremity elevation, and noted the clinical objective for Mr. Hannon's care as: "***[T]o maintain reduced symptoms and avoid hospitalization due to acute exacerbation over the next 3 months***".

208. Although Coyer documented Mr. Hannon's clinical objectives, he made no notes or records detailing the steps to be taken if Mr. Hannon's symptoms persisted or which presentation of symptoms would require that Mr. Hannon be transported to a hospital.

209. During the encounter, Coyer failed to make any inquiries of Mr. Hannon concerning missed doses of his antibiotic prescription, or other missed medications.

210. Likewise, Coyer made no inquiries of Mr. Hannon concerning his missed doses of insulin, his glucose levels or diet. Coyer took no steps to ensure that future insulin doses were administered and not withheld or that Mr. Hannon's glucose levels and diet were being closely monitored and managed.

211. Defendant Coyer failed to ensure D.O. Anderson, Sgt. Clemens and Cpt. Buchanan followed Coyer's order that Mr. Hannon receive a show pass.

212. Later that evening, on April 22nd, Defendant Registered Nurse Grace Uduka documented that Mr. Hannon was delivered to the clinic for wound care and made the following medical record entry:

> ***Resident presented to clinic A for wound care.***
> ***Wound care was performed per order.***
> ***Resident tolerated it well.***
> ***Resident was returned to housing unit by officer.***

213. Despite that Mr. Hannon's MCDCC medical records clearly documented that he was being treated for diabetic foot infection and that his diabetic wounds were previously malodorous with the presence of pus, Defendant Uduka failed to comply with standard diabetic wound care protocol. She too failed to drain his wounds, perform bone probing, properly document the wounds by measurement or photograph

and failed to ensure proper offloading to his feet and wounds. Uduka further failed to document the clinical reason upon which her departure from standard diabetic wound care protocol was based.

214. During the encounter with Nurse Uduka, Mr. Hannon requested to be taken to a hospital for treatment. Uduka declined his request.

215. Not only did Nurse Uduka fail to adhere to standard diabetic wound care protocols, she also failed to speak to a provider to see if she should arrange for Mr. Hannon to be transported to a hospital or other medical facility that could provide the diabetic wound care and treatment he required and was not receiving at MCDCC.

216. Additionally, Nurse Uduka failed to request that Defendants D.O. Hailey, Sgt. Lackey and Cpt. Van Allen and other detention staff comply with medical order for a shoe pass issued by Coyer and failed to report the violations of Coyer's medical order.

217. Following the early evening nursing encounter with Uduka, Mr. Hannon spoke with his pod supervisor, Defendant D.O. Hailey, and explained the medical orders issued by Coyer earlier that day. Mr. Hannon explained that his wounds were worsening, his need for shoes that fit and covered his feet and his need to be taken to a hospital for proper treatment. Defendant D.O. Hailey, under the supervision of Defendants Cpt. Van Allen and Sgt. Lackey, refused to provide him with footwear that covered the length of his feet and refused to permit him to wear his own shoes as required by Coyer's shoe pass order.

218. D.O. Hailey refused Mr. Hannon's request to be transported to a hospital.

219. Despite that Mr. Hannon was documented as a diabetic suffering from open wounds, active infection, prior amputations and the physical limitations therefrom, D.O. Hailey, under the supervision of Cpt. Van Allen and Sgt. Lackey, ordered Mr. Hannon to continue to wear the MCDCC—issued flip flops.

220. Following the April 22nd encounter with Coyer and despite Coyer expressly issuing medical orders for a shoe pass for Mr. Hannon, the MCDCC Supervisory Defendants and Detention Defendants and other detention staff members violated Coyer's medical order in their individual and collective failures to provide Mr. Hannon with the ordered shoe pass over the course of eight days.

221. Despite his pledge to personally oversee Mr. Hannon's care, Coyer took no steps over the course of the following eight days to ensure that MCDCC detention staff carried out his medical order for Mr. Hannon's shoe pass and Coyer further failed to intervene on the lapse of care when his order was violated daily by the Supervisory Defendants and Detention Defendants.

222. While Coyer ordered that Mr. Hannon receive daily wound care on his DFIs, this order was ignored by D.O. Fuller, under the supervision of Cpt. Buchanan and Sgt. Clemens. Mr. Hannon was not taken to the clinic and did not receive any wound care on April 23rd.

223. The neglect of Mr. Hannon and the disregard of the medial orders for a shoe pass and daily wound care continued on April 24th, April 25th and April 26th.

224. During the afternoon of April 24th, Mr. Hannon once again reported the worsening condition of his wounds to his pod supervisor, D.O. Rochelle Bryan, that

he had not received the ordered wound care, and that the MCDCC-issued flip flops were worsening his infection.

225. D.O. Bryan denied Mr. Hannon's requests to arrange to be transported to a hospital for care and treatment he needed. D.O. Bryan also failed to bring Mr. Hannon to the clinic for wound care.

226. Despite that Mr. Hannon was documented as a diabetic suffering from open wounds, active infection, prior amputations and the physical limitations therefrom, D.O. Bryan, under the supervision of Defendants Cpt. Dixon, Cpt. Jerrell and Sgt. Carter, ignored the medical order for a shoe pass and instead ordered Mr. Hannon to continue to wear the MCDCC-issued flip flops.

227. On the morning of Thursday, April 25th, Mr. Hannon reported his active infections, worsening condition and absence of wound care to his pod supervisor, Defendant D.O. Hailey.

228. D.O. Hailey, under the supervision of Defendant Sgt. Ashe, denied Mr. Hannon's requests to be transported to a hospital for care and treatment he needed. D.O. Hailey also failed to deliver Mr. Hannon to the clinic for wound care or provide him with the ordered shoe pass.

229. Neither Biondi, Coyer, nor any other Medical Defendant, took any steps to intervene upon the lapse of care and provide the daily wound care for Mr. Hannon's DFIs on April 23rd, April 24th, April 25th or April 26th. Additionally, not one of them arranged for Mr. Hannon to be transferred to a hospital for the evaluation and care he needed but did not receive at MCDCC.

230. While no wound care was provided to Mr. Hannon on April 25th, Mr. Hannon did receive an ultrasound of his lower extremities and x-ray imaging of his lower extremities.

231. The radiology report for Mr. Hannon's feet, issued by Dr. David Nguyen, indicated that no definitive osteomyelitis could be detected by x-ray and Dr. Nguyen documented that an evaluation with more sensitive imaging via MRI should be considered.

232. At no time while he was in the care and custody of Sheriff McFadden and under medical care of McFadden's medical agents, was any MRI imaging of Mr. Hannon's feet conducted.

233. Mr. Hannon's medical records reflect that on April 25, 2024, Licensed Nursing Assistant Carr again withheld and failed to administer Mr. Hannon's insulin and gabapentin doses and documented the bases for failing to administer those prescriptions as "***out of unit for wound care***". Carr's entries into Mr. Hannon's medication record conflict with his medical records showing that Mr. Hannon received no wound care that day.

234. There is no documentation indicating that LNA Carr took any steps to ensure that Mr. Hannon received the medications she withheld and failed to administer.

235. Not one of the Medical Defendants, Supervisory Defendants or Detention Defendants took any steps for Mr. Hannon to receive any of his missed medications.

236. On April 26th, Mr. Hannon again reported to his pod supervisor, Defendant D.O. Anderson, that his infected diabetic wounds were worsening and showed D.O.

Anderson the impact that wearing the MCDCC-issued flip flops were having on his wounds. Mr. Hannon showed Anderson that the flip flops not only left his wounds exposed and constricted blood flow, but he also explained that the grossly ill-fitting flip-flop combined with the force required to insert his foot into it, was causing his DFIs to split further and the skin around his wounds was peeling, tearing, swelling and bleeding.

237. After showing D.O. Anderson the worsening condition of his wounds, explaining yet again how his infections left him vulnerable to amputation, Mr. Hannon begged to be transported to a hospital for treatment. Defendant D.O. Anderson, under the supervision of Defendants Cpt. Buchanan and Sgt. Clemens, denied Mr. Hannon's plea and took no steps to confer with MCDCC medical staff to provide Mr. Hannon with the medical care he was ordered to receive but was not receiving.

238. Despite that Mr. Hannon was documented as a diabetic suffering from open wounds, active infection, prior amputations and a shoe pass order, D.O. Anderson, under the supervision of Cpt. Buchanan and Sgt. Clemens, took no steps to provide Mr. Hannon with the requisite shoe pass or medical care.

239. On Saturday, April 27th, Defendant Registered Nurse Smith documented that Mr. Hannon was delivered to MCDCC Clinic A for wound care. She documented that Mr. Hannon had been suffering a headache over the previous four days. Defendant Smith documented Mr. Hannon's blood pressure readings repeatedly fell below normal, and that Mr. Hannon's presentation and symptoms necessitated intervention from a prescribing provider.

240. Defendant Smith did not include the name of the MCDCC on-call provider she contacted but noted that Mr. Hannon's blood pressure medications would be modified, and that he should be given caffeine pain medication and Gatorade. Smith further documented, in the only Wound Care Flow Sheet in Mr. Hannon's MCDCC medical file, that Mr. Hannon now had two toes on his right foot that were ulcerous and one toe on his left continued to have an ulcer. She did not complete the entire form and did not photograph Mr. Hannon's wounds. She noted that Mr. Hannon's wounds were cleansed, covered in gauze and that, despite no wound care for the past four days, no drainage or foul odor was noted.

241. Defendant Smith failed to document whether she or the on-call provider with whom she conferred, ever assessed for or considered the need for Mr. Hannon to be transported to a hospital for evaluation and care.

242. Defendant Smith failed to comply with standard diabetic wound care protocol. Specifically, Smith failed to drain Mr. Hannon's wounds, probe the wounds, measure the wounds or photograph them and failed to document the clinical basis for her departure from providing Mr. Hannon with standard diabetic wound care.

243. During the nursing encounter with Smith, Mr. Hannon reported that he had not received wound care in the previous days, that his infections had significantly worsened, that he was experiencing increased warmth, redness, tenderness and swelling in the areas surrounding the wounds, that his wounds were splitting from the ill-fitting flip flops and that, at times, had not been given his medications.

244. Mr. Hannon begged Defendant Smith to arrange for him to be transported to a hospital so that he could get the medical care that he needed.

245. Not only did Smith deny Mr. Hannon's request to be taken to a hospital, but she also failed to respond in any way to detention staff's failure to provide him with the ordered shoe pass and to his reports of missed doses of medication, which were corroborated by his medication administration records.

246. Smith took no steps for Mr. Hannon to receive his missed medications, nor did she take any steps to ensure that future doses, including insulin, were administered and that his glucose levels and diet were being closely monitored and managed.

247. Smith responded to Mr. Hannon's reports of no wound care and missed medications by stating "***they are short-staffed***" and to his request to be transported to a hospital she stated, "***I cannot make that decision.***"

248. Smith then failed to take steps for Mr. Hannon to be transported to a hospital or other medical facility for the medical care he needed but was not receiving at MCDCC.

249. On the evening of April 27th, Defendant D. O. Martin and her supervisors, Defendants Maj. Durrah and St. Lackey, defied Coyer's medical orders and failed to provide Mr. Hannon with a shoe pass.

250. The following day, Sunday, April 28, 2024, Smith created a medical record in Mr. Hannon's MCDCC medical file which read:

> ***Wound care performed yesterday 4/24/24 for resident, unable to do wound care today d/t no available officer for clinic A.***

251. Upon information and belief, the medical record entered by Smith on April 28th was intended to refer to the wound care she performed on April 27th, not April 24th, and does not document any effort to comply with the daily wound care ordered, despite the detention staff being shorthanded.

252. Despite Coyer's order that Mr. Hannon receive daily wound care, Mr. Hannon did not receive wound care of any sort on Sunday, April 28th.

253. On that same day, Mr. Hannon reported to his pod supervisor, Defendant D.O. Amechi, that he had not received any wound care, could no longer physically withstand the pain caused when he was ordered to wear the MCDCC-issued flip flops and requested to be transported to a hospital.

254. D.O. Amechi, under the supervision of Cpt. Buchanan and Sgt. Clemens, refused Mr. Hannon's request to be transported to a hospital and failed to confer with MCDCC medical staff to ensure Mr. Hannon received the ordered daily wound care.

255. Despite that Mr. Hannon was documented as a diabetic suffering from open wounds, active infection, prior amputations, a medically ordered shoe pass and that he reported the immense pain he was suffering, D.O. Amechi ordered Mr. Hannon to continue to wear the MCDCC-issued flip flops.

256. On the evening of April 27th, Defendant D. O. Martin and her supervisors, Defendants Maj. Durrah and Sgt. Lackey, again defied Coyer's medical orders and failed to provide Mr. Hannon with a shoe pass.

257. In the morning hours of Monday, April 29th, according to Mr. Hannon's medical records, MCDCC Licensed Nursing Assistant, Kiara Smith withheld the following

prescription medications from Mr. Hannon: Xarelto, potassium chloride, lisinopril, carvedilol, isosorbide, insulin, Lipitor, Norvasc, and cetirizine. Smith documented the bases for failing to administer Mr. Hannon's prescriptions as "***out of unit***".

258. There are no notes, records or documents indicating that Kiara Smith, or any other Medical Defendant or MCDCC medical staff member, took any steps to ensure that Mr. Hannon received the medications that she withheld and failed to administer.

259. There are no MCDCC records indicating that Mr. Hannon was not present in Pod 2200 in the early morning hours of April 29th nor are there any movement records documenting Mr. Hannon's departure from Pod 2200 on April 28th or the morning of April 29th.

260. Later, on April 29th, Mr. Hannon, in dire need of wound care, was delivered to the MCDCC clinic where he received none. Instead, Nurse McCown conducted the required mental health and tuberculosis screenings performed on all MCDCC residents.

261. McCown completed the standardized forms used to document the details of the screening encounter.

262. The inquiries and documentation fields within the standardized forms call for the collection of a wide range of health data points ranging from blood pressure readings to skin condition, and from cardiothoracic health to current and prior mental health status.

263. Despite Mr. Hannon's MCDCC medical records reflecting his complex medical diagnoses and conditions, history of medical complications, prior amputations, current

diabetic wounds and active infection, as well as multiple lapses in daily wound care and prescription medications, McCown documented Mr. Hannon's health status as "***normal***" in every category throughout the standardized medical forms.

264. Notably and inexplicably, McCown even documented that the condition of Mr. Hannon's skin was "normal" despite that when he presented that day, he was suffering from peeling, bleeding, malodorous, inflamed flesh and infected wounds upon his skin that were oozing blood and green pus.

265. During the encounter with McCown on April 29th, Mr. Hannon reported that he had not received wound care in the previous days, that he had missed medications, and that the condition of his wounds was worsening. He then raised his legs and showed McCown his open, bleeding, infected diabetic wounds and requested that McCown assist him in arranging transportation to a hospital for evaluation and treatment.

266. McCown failed to drain or cleanse his wounds and refused to remove and replace the filthy, worn gauze dressings. She also failed to take any steps for Mr. Hannon to receive the ordered daily wound care from another medical staff member.

267. McCown's response to Mr. Hannon's reports and request for care on April 29th was, "***You're here with me for mental health and TB Screening***".

268. McCown failed to confer with Coyer or any other provider, to report that Mr. Hannon had been suffering lapses in his medical care, the status of his wounds, symptoms of worsening infection, his reports of missed prescription medication and

that his MCDCC medication administration records corroborated his reports of missed medications.

269. McCown took no steps to intervene upon the violations by the Supervisory and Detention Defendants in failing to provide Mr. Hannon with the shoe pass ordered by Defendant Coyer and she failed to report the violations of the medical order.

270. McCown took no steps for Mr. Hannon to be transported to a hospital or other medical facility to receive the medical care he required but was not receiving at MCDCC.

271. Despite Coyer's order that Mr. Hannon receive wound care daily, Mr. Hannon did not receive wound care of any sort on Monday, April 29th.

272. Neither Biondi, Coyer, nor any other Medical Defendant took any steps to intervene upon the lapse of care and provide medical care to Mr. Hannon on April 28th and 29th, nor were any steps taken to transfer Aaron Hannon to a hospital for the medical care he required but was not receiving at MCDCC.

273. Mr. Hannon reported to his April 29th pod supervisor, Defendant D.O. Skinner, that he had not received any wound care and that he could no longer physically withstand the pain caused from wearing the MCDCC-issued flip flops.

274. Mr. Hannon requested that D.O. Skinner speak to someone to arrange for him to be transported to a hospital.

275. In response to Mr. Hannon's reports and requests, D.O. Skinner, under the supervision of Defendants Cpt. Dixon and Sgt. Carter, declined to help arrange for Mr. Hannon to be transported to a hospital, failed to confer with MCDCC medical staff

about wound care ordered by Coyer and took no steps to intervene on Mr. Hannon's lapse in medical care.

276. Despite that Mr. Hannon was documented as a diabetic suffering from open wounds, active infection, severe pain, prior amputations and a shoe pass order, D.O. Skinner, under the supervision of Defendants Cpt. Dixon and Sgt. Carter, ordered Mr. Hannon to continue to wear the MCDCC-issued flip flops.

277. The evening of April 29th, Defendant D. O. Hailey and her supervisors, Defendants Cpt. St. Laurent and Sgt. Ashe, also defied Coyer's medical orders and failed to provide Mr. Hannon with a shoe pass.

278. Despite Coyer's order that Mr. Hannon receive daily wound care, Mr. Hannon did not receive wound care of any sort on Tuesday, April 30th.

279. On that day, Defendants Cpt. Dixon and Sgt. Carter defied Coyer's medical orders and failed to provide Mr. Hannon with a shoe pass.

280. Neither Biondi, Coyer, nor any other Medical Defendant took any steps to intervene on the lapse of care and provide care and treatment for Mr. Hannon's bilateral, infected, worsening diabetic wounds on April 30th, nor were any steps taken to transfer Aaron Hannon to a hospital for the medical care he needed but was not receiving prior to his release.

281. According to MCDCC Release Logs, Aaron Hannon was released from MCDCC at 5:19 pm on April 30, 2024, 13 days after his April 17th admission.

282. Never, during the course of that 13-day period, was Mr. Hannon issued footwear that provided full coverage beneath his feet, causing Mr. Hannon's feet to be exposed

to the pathogenic microbes and other infecting agents contained on every walking surface at MCDCC from the housing pod to the bathrooms and every floor surface in between.

283. Never, during that 13-day period, was Mr. Hannon allowed access to or issued footwear that accommodated the width of his feet, permitting proper blood circulation and preventing blood constriction in his feet.

284. Likewise, despite a medical shoe pass order on April 22nd, MCDCC Supervisory Defendants disregarded that order and allowed the Detention Defendants to deny every request made by Mr. Hannon to provide full coverage footwear or to be permitted to wear his own shoes, causing Mr. Hannon to develop diabetic ulcers which led to his bilateral diabetic foot infections. Those bilateral DFIs were then persistently exposed to microbes and other infectious agents that span the floor surfaces of MCDCC.

285. During his 13-day detention at MCDCC, Mr. Hannon suffered 45 missed doses of medication documented by MCDCC medication administration staff.

286. There are no records indicating that any of the Supervisory Defendants responsible for Mr. Hannon's pods reviewed, intervened or in any way resolved the lapses in providing his medically ordered accommodations, lapses in his medical care and lapses in the administration of Mr. Hannon's medications.

287. None of the wound care treatments Mr. Hannon did receive on his infected diabetic wounds included fully documenting his wounds, draining, probing or pressure off-loading.

288. Not only did Coyer's order for Mr. Hannon's wound care fail to adhere to standard diabetic wound care protocol, but Dr. Biondi failed to correct the order and the Medical Defendants failed to deliver wound care daily.

289. Mr. Hannon was first ordered to receive daily wound care on April 20th. Between that date and his release on April 30th, Mr. Hannon should have received at least 10 daily treatments for the care of his bilateral DFIs.

290. MCDCC medical staff delivered substandard wound care in 40% of the treatments ordered (a total of four) and altogether failed to deliver 60% of the treatments ordered. No member of MCDCC medical or detention staff, including the named defendants herein, took any steps to intervene upon the lapses in medical care, to resolve the lapses or to comply with the medical orders issued.

291. During Mr. Hannon's 13-day residence at MCDCC, Medical Defendants and Detention Defendants denied every request Hannon made to be transported to a hospital for the medical care he needed.

292. Between April 22, 2024 and April 30, 2024, Supervisory Defendants permitted Detention Defendants to deny Mr. Hannon his medically ordered shoe pass.

293. At no time between April 20th when it was determined that Mr. Hannon was suffering from active DFIs and his release, did any Medical Defendant collect any samples from Mr. Hannon's wounds to perform testing for proper pathogen identification for accurate determinations in treatment.

294. Additionally, at no time between confirmation that Mr. Hannon was suffering from active infection and his release did any Medical Defendant order or perform CBC

analysis to determine the efficacy of the Augmentin therapy on his infections or to determine if his infections required intravenous antibiotic therapy or surgical intervention.

**F. POST-RELEASE FROM MCDCC**

295. Hours after his release, on May 1, 2024, Mr. Hannon reported to Atrium Mercy Emergency Department (E.D.) seeking the medical care he had begged for while he was detained in MCDCC.

296. Upon arrival at Atrium Mercy E.D. Triage, Mr. Hannon's blood pressure was measured at 157/103mmHg, clinically indicating that Mr. Hannon's heart was under abnormally extreme, high pressure, the level at which damage to his organs was among the chief risk.

297. Mr. Hannon was immediately administered blood pressure regulation medications, and the treating team began to assess the status of his DFIs.

298. The attending emergency physician, Dr. Gary Mikhijian immediately ordered C & S testing of a sample from Mr. Hannon's DFIs to identify, select and initiate an accurate course of treatment for the infections.

299. Additionally, Dr. Mikhijian ordered imaging studies of the bones and veins within and around Mr. Hannon's feet, while nursing staff photographed Mr. Hannon's wounds.

300. Although the results of Mr. Hannon's imagining studies were negative for osteomyelitis and deep vein thrombosis at that time, Dr. Mikhijian told Mr. Hannon that his infections were advanced and his condition was extremely serious.

301. Mr. Hannon was prescribed a course of aggressive antibiotics, a combination of Keflex (cephalexin) and doxycycline, was advised to immediately consult with his orthopedic treatment team and to return to the emergency department if his symptoms worsened.

302. Despite a more aggressive antibiotic and proper wound care, Mr. Hannon's infections were too far gone and his condition worsened.

303. He returned to Atrium Mercy Emergency Department on May 11th, and reported that he believed his infections had worsened, that he was experiencing new leg pain, and significant lower extremity weakness and dizziness. The triage team documented with photos the presence and status of the multiple DFIs that began in MCDCC, along with lower extremity edema and pitting and ordered labs and imaging.

304. Based on his imaging and lab results, Mr. Hannon was immediately admitted to Atrium Mercy. Upon admission, a bilateral MRI of Mr. Hannon's feet revealed indications of osteomyelitis in his left third toe and indications of osteomyelitis in right second, third and fifth toes.

305. Mr. Hannon was administered Vancomycin via IV fusion. Vancomycin is a powerful glycopeptide antibiotic used to treat severe, resistant gram-positive systemic bacterial infections and is categorized as a "last resort" treatment.

306. After full evaluation of Mr. Hannon's condition, Orthopedist, Dr. Christopher Murawski, M.D., determined that the bilateral DFIs in Mr. Hannon's toes led to bilateral osteomyelitis and amputation of Mr. Hannon's third, fourth and fifth toes on his right foot and his third toe on his left foot, as well as, a hallux flexor tenotomy

(permanent dissection of the tendon) of his left grand toe, were required in order to arrest the infections and to prevent septic infection and death.

307. On May 15, 2024 and on August 22, 2024, Mr. Hannon underwent the amputations and tenotomy listed above, leaving him with two toes remaining on his left foot and no toes remaining on his right foot.

## FIRST CLAIM FOR RELIEF
## (Deliberate Indifference to Serious Medical Needs by Individual Defendants)

308. Plaintiff incorporates the paragraphs above as if fully set forth herein.

309. As a pretrial detainee at MCDCC, Mr. Hannon had substantive due process rights under the Fourteenth Amendment to be free from deliberate indifference to his serious medical needs. *See Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023).

310. At the time of his April 17, 2024 admission and throughout his detention at MCDCC, Mr. Hannon was at high risk for diabetic infection with particularly high vulnerability to amputation from infection.

311. Dr. Biondi, the Medical Defendants, the Supervisory Defendants and the Detention Defendants failed to communicate accurately, timely and properly with one another regarding Mr. Hannon's serious medical conditions and clinical presentation and instead allowed his condition to deteriorate and lead to uncontrolled infections, multiple amputations and a host of collateral consequences over the course of the last 29 months.

312. Supervisory Defendants failed to properly supervise Detention Defendants to ensure that Mr. Hannon's serious medical needs were met and his ordered medical accommodations were provided while he was detained at MCDCC.

313. The medical care that Mr. Hannon received at MCDCC between April 17 and April 30th 2024 was substandard and failed to meet his serious medical needs.

314. Mr. Hannon's serious medical need was so obvious that even those not medically trained, such as the fellow residents who advocated for Mr. Hannon to get medical care, could recognize Mr. Hannon's dire need for medical treatment.

**A. Supervisory Defendants and Detention Defendants**

315. After spending approximately three days in MCDCC's Orientation Pod, MCDCC detention staff transferred Mr. Hannon to General Population Housing Pod 2200 on April 21, 2024, where he remained until his release on April 30, 2024.

316. Supervisory Defendants Buchanan, Dixon, Durrah, Jerrell, St. Laurent, Van Allen, Ashe, Carter, Clemens, Lackey, and Perry were responsible for the training, supervision and compliance of Detention Defendants assigned to Pod 2200. This included Detention Defendants Amechi, Anderson, Hailey, Martin and Skinner.

317. Supervisory Defendants consciously disregarded the substantial risks of serious harm to MCDCC residents with serious medical needs, like Mr. Hannon, by failing to properly train Detention Defendants regarding their duties and responsibilities while assigned to supervise and care for residents within Pod 2200.

318. Supervisory Defendants consciously disregarded the substantial risks of harm to residents with serious medical needs, like Mr. Hannon, by failing to supervise

Detention Defendants who were assigned to supervise and care for residents within Pod 2200.

319. Detention Defendants and Supervisory Defendants each acted with deliberate indifference to Mr. Hannon's serious medical needs and the substantial risks of serious harm to Mr. Hannon.

320. Detention Defendants and Supervisory Defendants consciously disregarded the substantial risks of serious harm to Mr. Hannon by:

a. Failing to provide him with footwear that met his physical and medical needs;
b. Ordering him to wear footwear that exacerbated his serious medical condition, caused additional injury and jeopardized the healing of his infections once they began;
c. Failing to comply with Coyer's medical order requiring that Mr. Hannon receive a shoe pass;
d. Failing to confer with MCDCC medical staff to ensure that Mr. Hannon receive daily wound care;
e. Failing to report lapses in Mr. Hannon's medical care to Dr. Biondi or other MCDCC medical supervisory staff;
f. Failing to confer with MCDCC medical staff to ensure that Mr. Hannon received his daily prescription medications;
g. Failing to take steps with MCDCC medical staff to resolve lapses in the administration of prescription medications;

h. Denying Mr. Hannon's requests to receive necessary medical care for his serious medical conditions;

i. Failing to arrange for Mr. Hannon to be transported to a hospital to receive the medical care and treatment he needed and was not receiving at MCDCC;

j. Otherwise neglecting Mr. Hannon and repeatedly failing to respond to his serious medical needs; and

k. In such further ways as may be shown by the evidence.

321. The actions and inactions by the Supervisory and Detention Defendants were so grossly incompetent and inadequate as to shock the conscious and be intolerable to fundamental fairness.

322. The Supervisory and Detention Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983, for the violation of Mr. Hannon's substantive due process rights.

**B. Dr. Biondi and the Medical Defendants**

323. Dr. Biondi and the Medical Defendants failed to ensure that Mr. Hannon received the proper clinical assessment and treatment when his foot ulcers were discovered, despite clinical awareness of his condition, chronic medical diagnoses and knowledge of his medical history.

324. Dr. Biondi and the Medical Defendants should have known of Mr. Hannon's serious medical need and the associated significant risk of amputation and potential lethal infection and therefore had a duty to respond and act accordingly. *See Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023).

325. Medical Defendants, under the supervision of Dr. Biondi, knew or should have known that Mr. Hannon suffered from serious chronic medical conditions and was suffering from multiple serious bilateral diabetic foot infections.

326. Based on Mr. Hannon's diagnoses and medications, Dr. Biondi and the Medical Defendants knew that Mr. Hannon's prescription medications were high-priority medications, and that dosing lapses had serious medical consequences.

327. Dr. Biondi and the Medical Defendants knew or should have known that prioritizing timely, accurate issuance and administration of his medications was critical and that failure to issue and administer his medications could compromise his serious medical conditions in ways that were foreseeable.

328. Between April 17 and April 30, 2024, Medical Defendants, under the supervision of Dr. Biondi, consciously or recklessly disregarded the substantial risks of serious harm to Mr. Hannon by:

a. Failing to properly evaluate Mr. Hannon and designate him as medically fragile;

b. Failing to ensure that all of Mr. Hannon's prescription medications were properly bridged, issued and administered;

c. Failing to prepare an adequate plan of care, including ordering standard diabetic wound care and ensuring standard diabetic wound care was administered;

d. Failing to correctly document his DFIs and administer the standard diabetic wound care Mr. Hannon needed;

e. Failing to ensure that all medical orders were carried out;

f. Failing to cross-communicate with detention staff concerning Mr. Hannon's serious medical conditions and needs;

g. Failing to ensure Mr. Hannon was provided with footwear that accommodated the length and width of his feet and that provided a shoe barrier from the floors of MCDCC;

h. Failing to recognize the heightened threat that constricting lower extremity blood circulation presented to Mr. Hannon's already serious medical conditions and failing to prevent or intervene on such threat;

i. Neglecting Mr. Hannon's physical needs which were detrimental to his medical conditions;

j. Failing to ensure his medical and pharmaceutical records were collected;

k. Failing to oversee Mr. Hannon's medical care and intercede on lapses in his medical care;

l. Failing to take available steps to prevent Mr. Hannon from contracting infections and exacerbating the status of his other chronic, serious medical conditions;

m. Failing to intervene when detention staff defied Coyer's medical order requiring that Mr. Hannon receive a shoe pass;

n. Failing to confer with Mr. Hannon's treating physicians and pharmacists on his care;

o. Failing to confer with an MCDCC doctor or Dr. Biondi on Mr. Hannon's care;

p. Failing to report lapses in Mr. Hannon's medical care to MCDCC medical and detention supervisory staff;

q. Failing to transfer Mr. Hannon to a hospital or other medical facility that could provide the medical care he needed and was not receiving at MCDCC;

r. Otherwise neglecting Mr. Hannon and failing to respond to his serious medical needs; and

s. In such further ways as may be shown by the evidence.

329. From the time that Mr. Hannon's DFIs presented around April 19, 2024, through the 11 days that followed, Mr. Hannon's infections worsened and despite his worsening condition, neither Dr. Biondo nor the Medical Defendants took any steps to increase or modify the medical care and treatment Mr. Hannon received.

330. Dr. Biondi and the Medical Defendants left Mr. Hannon to suffer despite his serious and worsening medical needs.

331. The Medical Defendants failed to respond to Mr. Hannon's serious medical needs despite their actual knowledge of the risks of serious harm and even though an objectively reasonable person under similar circumstances would have recognized and appreciated the risks involved.

332. Dr. Biondi and the Medical Defendants acted with deliberate indifference to the serious medical needs of Mr. Hannon.

333. The medical care provided by the Medical Defendants, under the supervision of Dr. Biondi, was a gross violation of the accepted standards of practice and was so

grossly incompetent and inadequate as to shock the conscious and be intolerable to fundamental fairness.

334. Dr. Biondi and the Medical Defendants Coyer, are liable to Plaintiff pursuant to 42 U.S.C. § 1983, for the violation of Mr. Hannon's substantive due process rights.

335.

**SECOND CLAIM FOR RELIEF**
**(Policy or Custom of Deliberate Indifference by Defendants Mecklenburg County, Sheriff McFadden, Dr. Biondi and Reserve Health)**

336. Plaintiff incorporates the paragraphs above as if fully set forth herein.

337. At the time of the events in this case, Mecklenburg County and Sheriff McFadden had an agreement with Wellpath, LLC who had an agreement with Reserve Health to provide medical care to MCDCC residents and detainees

338. The MCSO Medical Policies and Procedures developed and implemented by the Mecklenburg County Sheriff's Office were first reviewed and approved by Mecklenburg County. In its review and approval process, Mecklenburg County consulted with Wellpath, LLC, Reserve Health, Dr. Biondi and Sheriff McFadden.

339. On or before April 17, 2024, Mecklenburg County, Sheriff McFadden, Dr. Biondi and Reserve Health knew the following information:

a. That the Medical Director overseeing the medical care provided at the facility was permitted to be absent from MCDCC for six days every week and was only required to be present once per week;

b. That individuals with chronic, serious medical conditions, including diabetes, heart disease and hypertension were regularly arrested and delivered to MCDCC, booked and admitted into the jail;

c. That under MCSO Medical Policies and Procedures, there were no provisions set forth to ensure that the medical needs of patients suffering with serious, chronic medical conditions, who are also at risk of experiencing serious medical complications, were adequately met;

d. That the MCSO Medical Policies and Procedures contained no provisions for adequate and proper care for residents with diabetes who also have a history of DFI. Despite the frequency that DFIs occur in those with diabetes, MCSO Medical Policies and Procedures are void of any reference to or provision for administering standard diabetic wound care;

e. That MCSO Medical Policies and Procedures provide no methods or processes by which medical staff are to administer diabetic wound care or any procedure for escalation or transfer to provide such care when medical needs call for standard diabetic wound care the medical staff is unable to provide;

f. That Dr. Biondi, regularly made medical decisions for residents over the phone without actually examining residents, reviewing their medical records or auditing the records of the MCDCC medical staff making medical decisions and providing medical care;

g. That MCDCC did not have sufficient medical staffing, supervision, or resources to medically treat, monitor and care for those suffering from DFIs or other diabetic wounds;

h. That MCDCC did not have sufficient detention staffing, or supervision, to facilitate medical treatment, monitoring and caring for those suffering from DFIs or other diabetic wounds;

i. That a resident like Mr. Hannon, suffering from multiple, bilateral DFIs, had no alternative means or access to receive adequate medical care for his DFIs;

j. That standards in care for the delivery of adequate diabetic wound care requires a clinical setting that meets required space, lighting, temperature controls and surface sterility. MCSO Medical Policies and Procedures are void of any requirements or provisions instituting basic clinical facility requirements within which standard diabetic wound care is administered;

k. That Wellpath and Reserve Health provided insufficient medical staff for MCDCC, such that the Medical Defendants were not required or equipped to meet the standards of adequate diabetic wound care;

l. That Wellpath and Reserve Health provided medical staff for MCDCC, such as the Medical Defendants, who were not properly trained to recognize the early signs of systemic and serious diabetic infection or the need for treatment escalation;

m. That residents suffering with DFIs, like Mr. Hannon, were confined in single cells within MCDCC's general population housing units, deprived of access to

regular wound assessments with close interval monitoring by qualified medical providers;

n. That MCDCC detention staff, such as Detention Defendants, were improperly trained and inadequately supervised to properly monitor, care for and respond to the needs of residents suffering with serious medical needs, including DFIs, who resided within MCDCC's general population pod;

o. That the following MCDCC residents had known, serious medical needs that went unmet while under the care, custody and safekeeping of Defendant McFadden, his staff and/or MCDCC medical staff, who failed to comply with North Carolina statutes and/or administrative codes and/or NCCHC standards and/or failed to provide adequate healthcare for MCDCC residents, leading to death:

*Kenneth Bingham*

*Russell Fincham*

*Derrick Geter*

*Karon Golightly*

*Karla Griffin*

*John Devin Haley*

*Elijah Kelly*

*Francine Laney*

*Michael Mangan*

*Jemarcus McIlwaine*

*Bryon Miller*

*William Rhinesmith*

*Jerome Thompson*

*Michael Trent*

*Desmond Whisnant*

*Renny Mobley*

*George Benfield*

p. That the Mecklenburg County Sheriff's Office has been previously cited by NCDHHS on multiple occasions for failing to meet North Carolina's statutory mandatory minimum requirements related to care and supervision of resident detainees.

**A. Mecklenburg County**

340. Mecklenburg County was aware that the agreement with Wellpath and Reserve Health provided inadequate medical care and supervision for residents with serious medical needs, and that training for both MCDCC medical and detention staff was inadequate to meet the needs of those with serious medical needs.

341. Upon information and belief, Mecklenburg County was aware of Sheriff McFadden's practice or unofficial policy to allow residents in need of diabetic wound care to remain at MCDCC, rather than transfer them to a hospital or other medical facility to receive necessary medical care.

342. Mecklenburg County approved or condoned these policies or customs and did not have a medical plan that provided adequate medical care, medical supervision,

and adequate facilities and equipment to meet the standards for diabetic wound care for MCDCC residents, like Aaron Hannon, with such needs.

343. Through its approval of the policies or customs at MCDCC, the inadequate medical plan, and the contractual relationship with Wellpath and Reserve Health, Mecklenburg County had an official policy or custom of deliberate indifference to the serious medical needs of residents, like Aaron Hannon, with serious chronic medical needs, high susceptibility to diabetic wounds and infection, and a heightened medical need for the prevention of limb loss.

344. Mecklenburg County's official policy or custom was a cause of and the moving force behind the violation of Mr. Hannon's right to be free from deliberate indifference to his serious medical needs.

345. Mecklenburg County is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policy or custom which caused the violation of Mr. Hannon's substantive due process rights at MCDCC.

**B. Defendants Sheriff McFadden and Dr. Biondi**

346. Sheriff McFadden and Dr. Biondi approved the MCSO Medical Policies and Procedures and the unwritten policy or custom to admit, house and care for residents like Aaron Hannon who suffered with chronic medical needs, who have high susceptibility to diabetic wounds and infection along with heightened requirements for the prevention of limb loss and McFadden and Biondi did so without:

(1) instituting requisite clinical facilities,

(2) acquiring necessary equipment, and

(3) providing required clinical training to detention staff and medical staff to properly care for and monitor such residents.

347. Sheriff McFadden's official policies or customs were inadequate because they did not provide appropriate supervision or medical care to residents with serious medical needs, like Aaron Hannon, who have high susceptibility to diabetic wounds and infection along with heightened requirements for the prevention of limb loss.

348. Sheriff McFadden failed to use reasonable efforts to provide sufficient detention staff to enable the MCDCC medical staff to provide adequate healthcare services to residents in need of care.

349. In addition, on or before April 17, 2024, Sheriff McFadden and Dr. Biondi knew that:

a. Due to the number of residents suffering from diabetes, in-service training was needed on proper recognition, prioritization and management of serious medical needs related to diabetic complications including, but not limited to, diabetic foot ulcers and diabetic-related infection;

b. No in-service training was provided to MCDCC detention staff on recognizing, prioritizing or managing the serious medical needs related to diabetic complications;

c. Critical medical decisions like determining whether to provide diabetic wound care within MCDCC or to transfer residents in need of such care to a hospital or wound care facility, were left to inadequately trained detention officers and medical staff, absent sufficient medical supervision and oversight;

d. Sheriff McFadden had a non-delegable duty to provide adequate medical care to residents with serious medical needs; and

e. Sheriff McFadden gave Wellpath, LLC and Reserve his responsibility to provide residents with medical care, including residents with serious medical needs, such as diabetic wound care and infection, without providing the requisite facilities and equipment and requiring training of MCDCC medical staff to ensure those suffering from diabetic wounds and infection received the requisite adequate care.

350. Sheriff McFadden and Dr. Biondi failed to provide adequate training for detention staff and medical staff, respectively, at MCDCC on proper recognition, prioritization and management of serious medical needs related to diabetic complications such as diabetic foot ulceration, diabetic foot infection, and other diabetic infection.

351. Sheriff McFadden and Dr. Biondi knew that at all times a percentage of the MCDCC resident population suffered from diabetes and had related serious medical needs with risks of complications and, without adequate training and policies to address these needs and risks, those MCDCC residents would not receive adequate medical care and treatment, in violation of their substantive due process rights.

352. Sheriff McFadden and Dr. Biondi's failure to provide adequate training and sufficient policies for detention staff and medical staff, respectively, evinces deliberate indifference to the rights of MCDCC residents, including Mr. Hannon.

353. Sheriff McFadden and Dr. Biondi had official policies and/or customs of deliberate indifference to the serious medical needs of residents, like Mr. Hannon, who suffered with complex, chronic conditions with high risk of complication.

354. The Detention Defendants and Supervisory Defendants acted in accordance with Sheriff McFadden's policies or customs through their deliberate indifference to the serious medical needs of Mr. Hannon during his detention.

355. Sheriff McFadden and Dr. Biondi condoned decisions by Supervisory and Detention Defendants and Medical Defendants when they failed to provide Mr. Hannon with footwear that met his medical needs, failed to provide him with the medical care he required and refused to transport him to a hospital or medical facility that could provide the medical care he needed.

356. Sheriff McFadden and Dr. Biondi's official policies and/or customs were a cause of, and the moving force behind, the violation of Mr. Hannon's right to be free from deliberate indifference to his serious medical needs.

357. Sheriff McFadden and Dr. Biondi are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policies or customs which caused the violation of Mr. Hannon's substantive due process rights at MCDCC.

**C. Reserve Health**

358. Reserve Health, through Dr. Biondi approved Sheriff McFadden's policy or custom of allowing insufficiently trained medical and detention staff to determine whether treatment for diabetic wounds and infection was administered within

MCDCC or if residents in such need were transferred to a hospital or facility that could provide the care.

359. Reserve Health, through Dr. Biondi, knew that Sheriff McFadden's policy and custom permitted the failure to provide the requisite facilities, equipment and training to MCDCC medical staff to ensure those suffering from DFIs and other diabetic complications received adequate care.

360. Dr. Biondi acted in accordance with this policy or custom when he failed to properly oversee the care and treatment Mr. Hannon was receiving at MCDCC, failed to intervene on documented lapses in medical care and failed to ensure that Mr. Hannon was transferred to a hospital or facility that could provide the medical care he required and was not receiving at MCDCC.

361. In addition, on or before April 17, 2024, Reserve Health failed to provide adequate medical staffing at MCDCC and failed to provide adequate supervision of the medical staff treating those suffering from DFIs and other diabetic complications.

362. Reserve Health knew that at all times that a percentage of the MCDCC resident population suffered from diabetes and had related serious medical needs that posed risks of serious complication and, without adequate training and policies to address these needs and risks, these residents would not receive adequate medical care and treatment, in violation of their substantive due process rights.

363. The failure of Reserve Health to provide adequate staffing, supervision and training showed a deliberate indifference to the rights of MCDCC residents, including Mr. Hannon.

364. Reserve Health had official policies or customs of deliberate indifference to the serious medical needs of residents, like Mr. Hannon, who suffered from chronic, serious medical conditions that posed high risk of serious complications.

365. Dr. Biondi acted in accordance with policies or customs of Reserve Health through his deliberate indifference to the serious medical needs of Mr. Hannon.

366. The official policies or customs of Reserve Health were a cause of, and the moving force behind, the violation of Mr. Hannon's right to be free from deliberate indifference to his serious medical needs.

367. Reserve Health is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policy or custom which caused the violation of Mr. Hannon's substantive due process rights at MCDCC.

## THIRD CLAIM FOR RELIEF
## (Medical Malpractice by Medical Defendants)

368. Plaintiff incorporates the paragraphs above as if fully set forth herein.

369. During their care of Mr. Hannon, Medical Defendants Coyer, Elliott-McLaren, Smith and Uduka had a duty to use their best judgment, to use reasonable care and diligence in the application of their knowledge and skill to Mr. Hannon's care, and to provide health care in accordance with the standards of practice among practitioners with similar training and experience, in the same or similar communities.

370. During her care of Mr. Hannon, Medical Defendant Dr. Le-Bliss had a duty to use her best judgment, to use reasonable care and diligence in the application of her knowledge and skill to Mr. Hannon's care, and to provide health care in accordance

with the standards of practice among internal medicine physicians with similar training and experience, in the same or similar communities.

**A. Physician Assistant Coyer**

371. At a minimum, Defendant PA Coyer was negligent and breached his duty of care to Mr. Hannon by failing to use his best judgment, failing to use reasonable care and diligence in the application of his knowledge and skill to Mr. Hannon's care, and failing to provide health care in accordance with the standards of practice among licensed nurse practitioners with similar training and experience in the same or similar communities, including by:

a. Failing to prepare an adequate plan of care for Mr. Hannon, including ordering standard diabetic wound care and ensuring standard diabetic wound care was administered as ordered;
b. Failing to personally administer standard diabetic wound care on Mr. Hannon's multiple, bilateral DFIs;
c. Failing to ensure that medical orders for Mr. Hannon's care were carried out by MCDCC detention and medical staff;
d. Failing to ensure Mr. Hannon received footwear that met his medical needs;
e. Failing to follow through and test the efficacy of Augmentin and properly monitor the status of Mr. Hannon's DFIs or ensure such monitoring was implemented in his care plan;
f. Failing to take available steps to protect Mr. Hannon from environmental exposures that posed additional risks for and exacerbation of infection;

g. Failing to properly oversee Mr. Hannon's medical care and intercede on lapses in medical care;

h. Failing to confer with Mr. Hannon's treating physicians and pharmacists on his care;

i. Failing to transfer Mr. Hannon to a hospital or other medical facility equipped to provide the medical care he required and was not receiving at MCDCC;

j. Otherwise neglecting Mr. Hannon and failing to respond to his serious medical needs; and

m. In such further ways as may be shown by the evidence.

**B. Nurses Elliott-McLaren, Smith, and Uduka**

372. At a minimum Medical Defendants Elliott-McLaren, Smith, and Uduka were negligent and breached their duty of care to Mr. Hannon by failing to use their best judgment, failing to use reasonable care and diligence in the application of their knowledge and skill to Mr. Hannon's care, and failing to provide health care in accordance with the standards of practice among registered nurses with similar training and experience in the same or similar communities, including by:

a. Failing to adequately monitor Mr. Hannon despite his serious medical needs;

b. Failing to comply with and provide standard diabetic wound care;

c. Failing to otherwise ensure that Mr. Hannon received adequate diabetic wound care;

d. Failing to perform bone probing on Mr. Hannon's diabetic wounds;

e. Failing to ensure Mr. Hannon received footwear that met his medical needs;

f. Failing to take available steps to protect Mr. Hannon from environmental exposures that posed additional risks of infection;

h. Failing to oversee Mr. Hannon's care and intercede on lapses in his medical care or take steps to ensure that oversight and intercession on lapses in medical care were implemented;

i. Failing to report lapses in Mr. Hannon's care to MCDCC medical and detention supervisory staff;

j. Failing to arrange transfer of Mr. Hannon to a hospital or other medical facility that could provide the medical care he needed and was not receiving at MCDCC;

k. Otherwise neglecting Mr. Hannon and failing to respond to his serious medical needs; and

l. In such further ways that may be shown by the evidence.

373. Medical Defendants Elliott-McLaren, Smith, and Uduka were grossly negligent in their care of Mr. Hannon because their actions: (a) lacked even slight care, (b) showed indifference to the rights and welfare of his person, (c) were of an aggravated character, compounded over time (d) were committed in reckless disregard for the rights and safety of Mr. Hannon, and (e) intentionally failed to comply with their duties as registered nurses.

## C. Dr. Le-Bliss

374. Dr. Le-Bliss was negligent and breached her duty of care to Mr. Hannon by failing to use her best judgment, failing to use reasonable care and diligence in the application of her knowledge and skill to Mr. Hannon's care, and failing to provide health care in accordance with the standards of practice among physicians who practice internal medicine with similar training and experience in the same or similar communities, including by:

a. Failing to properly evaluate Mr. Hannon and to timely and accurately bridge Mr. Hannon's prescription medications;
b. Failing to ensure Mr. Hannon's medical records were collected and reviewed;
c. Failing to ensure that Mr. Hannon's prescription medications were administered and to take steps to prevent further lapses in the administration of his insulin therapy;
d. Failing to order or otherwise ensure metabolic panel testing was performed on Mr. Hannon;
e. Disregarding Mr. Hannon's medical history that included heightened risk for bilateral DFI, osteomyelitis and amputation;
f. Failing to order that Mr. Hannon receive orthopedic shoes or footwear that provided proper fit to prevent exposure to infection, prevent circulation constriction and ensure proper offloading;
g. Failing to address Mr. Hannon's elevated blood pressure and poor blood oxygen saturation levels;

h. Failing to communicate the basis of Mr. Hannon's serious medical needs and needs for accommodation to detention and nursing staff;

i. Failing to prepare a plan of care for Mr. Hannon, including but not limited to, close monitoring of his blood glucose levels, diet, blood pressure, signs of potential DVT, diabetic foot ulceration and DFI;

j. Failing to properly supervise the care provided by nursing staff following the April 18, 2024 encounter;

k. Otherwise neglecting Mr. Hannon and failing to treat and manage his serious medical conditions; and

l. In such further ways as may be shown by the evidence.

375. Dr. Le-Bliss was grossly negligent in her care of Mr. Hannon because her actions: (a) lacked even slight care, (b) showed indifference to the rights and welfare of his person, (c) were of an aggravated character, (d) were committed in reckless disregard for the rights and safety of Mr. Hannon, and (e) intentionally failed to comply with his duties as an internist.

376. Medical Defendants Elliott-McLaren, Smith, and Uduka employed as registered nurses were hired by Wellpath, LLC and acting within the course and scope of their employment when they provided nursing care to Mr. Hannon at MCDCC.

377. PA Coyer was employed by Reserve Health acting within the course and scope of his employment when he treated Mr. Hannon at MCDCC.

378. Dr. Le-Bliss was employed by Reserve Health acting within the course and scope of her employment when she treated Mr. Hannon at MCDCC.

379. Reserve Health is vicariously liable to Plaintiff, pursuant to the doctrine of *Respondeat Superior*, for the medical malpractice by Coyer and Dr. Le-Bliss.

## FOURTH CLAIM FOR RELIEF
## (Action on Official Bond Against Defendants Sheriff McFadden and Ohio Casualty)

380. Plaintiff incorporates the paragraphs above as if fully set forth herein.

381. Sheriff McFadden procured an official bond as principal from Ohio Casualty in the sum of $25,000 and such bond was in effect at all relevant times to his action.

382. Ohio Casualty joined with Sheriff McFadden as surety in the execution of the official bond and thereby undertook to be jointly and severally liable for the failure for Sheriff McFadden and his detention officers to faithfully perform the duties of his office as Sheriff of Mecklenburg County.

383. The Supervisory Defendants and Detention Defendants were acting within the course and scope of their employment as Mecklenburg County detention officers and under color of state law under Sheriff McFadden's office during their interactions with Mr. Hannon on April 17th through April 30th, 2024.

384. The acts and omissions of the Supervisory Defendants and Detention Defendants, as alleged in this action and imputed to Sheriff McFadden under the doctrine of *Respondeat Superior*, constituted neglect, misconduct, misbehavior and/or a breach of their official duties as detention officers.

385. Sheriff McFadden and Ohio Casualty are jointly and severally liable to Plaintiff, pursuant to N.C. Gen. Stat. § 58-76-5, for Mr. Hannon's personal injuries to the extent of the official bond.

## FIFTH CLAIM FOR RELIEF

**(Corporate Negligence and Gross Negligence by Defendant Reserve Health)**

386. Plaintiff incorporates the paragraphs above as if fully set forth herein.

387. At all times relevant to this action, Reserve Health had a duty to use reasonable care in performing its corporate policy, management, and/or administrative functions and decisions at MCDCC.

388. At all times relevant to this action, Reserve Health was aware that it, through Dr. Biondi and other employees, was responsible for instituting policies training and supervision for medical staff at MCDCC that ensured adequate medical care and medical monitoring for MCDCC residents with serious, chronic medical needs with high susceptibility to diabetic wounds and infection along with heightened requirements for the prevention of limb loss.

389. Reserve Health was aware that Medical Defendants employed as registered nurses and licensed nursing assistants were not fit to provide the requisite nursing care to MCDCC residents with serious medical needs, like Mr. Hannon, because they lacked the necessary clinical facilities, equipment, skills, training and experience and were inadequately supervised by Dr. Biondi, Dr. Le-Bliss or another licensed physician.

390. Reserve Health was negligent and breached its duty of care to Mr. Hannon by:

   a. Failing to institute sufficient policies for MCDCC medical staff to ensure that adequate medical care and medical monitoring was provided to MCDCC

residents with serious, chronic medical needs with high susceptibility to diabetic wounds and infection, along with heightened requirements for the prevention of limb loss;

b. Failing to provide proper training for MCDCC medical staff on medical care and monitoring for MCDCC residents with serious, chronic medical needs with high susceptibility to diabetic wounds and infection along with heightened requirements for the prevention of limb loss;

c. Allowing MCDCC residents with signs of serious infection to be diagnosed by nursing staff, absent physician oversight;

d. Failing to have a physician or physician extender present at MCDCC more than five times per week;

e. Failing to institute a policy requiring an in-person medical examination by a physician or other provider before granting medical clearance for residents with serious medical needs to ensure those needs can be met without delay;

f. Failing to institute policies or protocols whereby MCDCC residents with symptoms of diabetic foot infections are transferred to a hospital or other facility where their treatment needs can be met;

g. Failing to properly monitor and supervise the performance of Le-Bliss, Coyer, Elliott-McLean, Smith, and Uduka;

h. Failing institute proper policies, staffing and/or supervision at MCDCC to provide adequate medical care for residents with serious, chronic medical

needs with high susceptibility to diabetic wounds and infection along with heightened requirements for the prevention of limb loss; and

i. In such further ways as may be shown by the evidence.

391. Reserve Health was grossly negligent in performing its corporate administrative duties due to its willful or wanton conduct.

392. Reserve Health failed to carry out its duties imposed by law or contract which were necessary to protect the safety of MCDCC residents and acted with conscious and intentional disregard for the rights and safety of others, including Aaron Hannon.

393. Reserve Health is liable for corporate and administrative negligence that caused Mr. Hannon's personal injuries at MCDCC.

## **DAMAGES**

1. As a direct and proximate result of individual Defendants' deliberate indifference, medical malpractice, negligence and gross negligence, Aaron Hannon suffered severe, consequential injuries, disfigurement and permanent physical disability as a result of his detention at MCDCC from the preventable diabetic wounds caused by failing to accommodate his needs leading to serious infection that resulted in multiple amputations and a myriad of medical complications that followed.

2. Due to his personal injuries, Mr. Hannon experienced and continues to experience physical pain, disfigurement, reduced mobility, mental suffering and mental anguish.

3. Mr. Hannon also experienced permanent physical disability and hardship from the loss of use of his body due to his physical injuries and the deterioration of his medical condition.

4. Mr. Hannon is entitled to recover compensatory damages from Medical Defendants, jointly and severally, for Mr. Hannon's personal injuries.

5. As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, negligence and gross negligence, Mr. Hannon suffered injury that led to infection that then necessitated multiple limb amputations. Because of the wounds and infections he contracted at MCDCC, and because of the substandard medical care he received for the wounds and infections while at MCDCC, he has endured a myriad of complications requiring more than 14 hospitalizations between the time of his release from MCDCC and the date of this filing.

6. His amputations have permanently restricted his ability to participate in physical activities for the rest of his life.

7. His amputations have increased the already heightened risk for future amputations, as well as caused additional health complications.

8. Mr. Hannon would not have contracted diabetic foot ulcers, suffered the infections or endured the cascade of consequences, if Defendants had accommodated his footwear needs and provided adequate medical care to meet his serious medical needs.

9. As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, negligence, and gross negligence, Mr. Hannon is entitled to recover

damages for physical pain, and mental anguish, permanent disfigurement.

10. As a direct and proximate result of the deliberate indifference, medical malpractice, negligence, and gross negligence of Reserve Health, Dr. Biondi and the Medical Defendants, Mr. Hannon is entitled to recover punitive damages.

11. Mr. Hannon is entitled to recover compensatory damages from Defendants, jointly and severally, for Mr. Hannon's personal injuries.

12. The acts of deliberate indifference toward Mr. Hannon's serious medical needs by the Supervisory Defendants, Detention Defendants, and Medical Defendants, were committed with reckless or callous indifference to Mr. Hannon's civil rights allowing him to recover punitive damages from these Defendants under 42 U.S.C. § 1983.

13. The policies and customs of deliberate indifference to the serious medical needs of residents with serious medical needs, like Mr. Hannon, by Sheriff McFadden, Reserve Health and Dr. Biondi occurred with reckless or callous indifference to the civil rights of MCDCC residents, including Mr. Hannon, allowing him to recover punitive damages from these Defendants under 42 U.S.C. § 1983

14. The acts of medical malpractice by the Medical Defendants, as alleged above, were done with conscious and intentional disregard of and indifference to the rights and safety of others, including Mr. Hannon, which each of them knew or should have known, was reasonably likely to result in injury, damage, permanent disfigurement or death.

15. The medical malpractice committed by the Medical Defendants was willful or wanton conduct as defined in N.C. Gen. Stat. § 1D-5.

16. The acts of corporate negligence and gross negligence by Reserve Health, as alleged above, were committed with conscious and intentional disregard of and indifference to the rights and safety of others, including Mr. Hannon, which Reserve Health knew or should have known, was reasonably likely to result in injury, damage, permanent disfigurement or death.

17. Upon information and belief, Reserve Health intentionally provided inadequate clinical staffing, monitoring, and supervision at MCDCC placing residents at risk of serious injury or death, to increase profits.

18. The corporate negligence and gross negligence committed by Reserve Health was willful or wanton conduct as defined in N.C. Gen. Stat. § 1D-5.

19. Dr. Biondi, an officer, manager and owner of Reserve Health, participated in and/or condoned the willful or wanton conduct committed by Reserve Health.

20. Mr. Hannon is entitled to recover punitive damages from Medical Defendants under N.C. Gen. Stat. § 1D-5.

21. Mr. Hannon is also entitled to recover reasonable attorneys' fees and litigation expenses from Defendants (*excluding Ohio Casualty*) pursuant to 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays the Court for the following relief:

1. Compensatory damages from Defendants, jointly and severally, for personal injuries;

2. Punitive damages from the Supervisory Defendants, Detention Defendants, Medical Defendants, Sheriff McFadden, Dr. Biondi and Reserve Health under 42

U.S.C. § 1983;

3. Punitive damages from the Medical Defendants, Dr. Biondi and Reserve Health under N.C. Gen. Stat. § 1D-15;

4. Reasonable attorneys' fees and litigation expenses from Defendants (*excluding Ohio Casualty)* pursuant to 42 U.S.C. § 1988;

5. Costs of court and interest as allowed by law;

6. A trial by jury on all disputed issues of fact; and

7. Such other and further relief as the Court may deem just and proper.

This the 22nd day of October, 2026.

/s/ Amanda A. Mingo
Amanda A. Mingo, NC State Bar #24423
/s/ Katie C. Clary
Katie Clary, NC State Bar # 39248
*Attorneys for Plaintiff*
Rawls, Scheer, Clary, & Mingo, PLLC
2333 Randolph Road, Suite 100
Charlotte, NC 28207
T: 704-376-2300
amingo@rscmlaw.com
kclary@rscmlaw.com